The STATE of Ohio, Appellee,

v.

CARTER, Appellant.

[Cite as *State v. Carter,* 157 Ohio App.3d 689, 2004-Ohio-3372.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–030657.

Decided June 29, 2004.

Michael K. Allen, Hamilton County Prosecuting Attorney, and Ronald W. Springman, Assistant Prosecuting Attorney, for appellee.

David H. Bodiker, State Public Defender, and Steven Ferréll, Assistant Public Defender, for appellant.

HILDEBRANDT, Judge.

{¶ 1} Petitioner-appellant, Cedric Carter, has taken the instant appeal from the denial of his postconviction petition in which he sought relief from his death sentence on the ground that he is mentally retarded. On appeal, Carter advances four assignments of error. Upon our determination that Carter was entitled to a hearing on his petition, we reverse the judgment of the common pleas court.

{¶ 2} In June 1992, a Hamilton County jury found Carter guilty of aggravated robbery and aggravated murder in connection with the shooting death of a convenience store clerk during an armed robbery. The trial court imposed for aggravated murder a sentence of death. Carter's convictions were upheld on direct appeal to this court[1] and to the Ohio Supreme Court,[2] and the United States Supreme Court denied his petition for a writ of certiorari.[3]

{¶ 3} In November 1997, we affirmed the common pleas court's denial of Carter's first postconviction petition.[4] The Ohio Supreme Court declined jurisdiction in his appeal of our decision.[5]

{¶ 4} In June 1999 and September 2000, Carter filed applications to reopen his direct appeal. We denied the applications. Carter appealed to the Ohio Supreme Court our denial of his second application. The Supreme Court affirmed.[6]

{¶ 5} On June 6, 2003, Carter filed with the common pleas court a second postconviction petition. In this petition, he advanced a single claim for relief,

---

1. See *State v. Carter* (Nov. 3, 1993), 1st Dist. No. C–920604, 1993 WL 512859.

2. See *State v. Carter* (1995), 72 Ohio St.3d 545, 651 N.E.2d 965.

3. See *Carter v. Ohio* (1995), 516 U.S. 1014, 116 S.Ct. 575, 133 L.Ed.2d 498.

4. See *State v. Carter* (Nov. 14, 1997), 1st Dist. No. C–960718, 1997 WL 705487.

5. See *State v. Carter* (1998), 81 Ohio St.3d 1467, 690 N.E.2d 1287.

6. See *State v. Carter* (2001), 93 Ohio St.3d 581, 757 N.E.2d 362.

requesting that his death sentence be vacated or set aside on the ground that he is mentally retarded and thus that his execution would violate the proscription against cruel and unusual punishment contained in the Eighth Amendment to the United States Constitution. Carter filed with his petition an array of motions, seeking, among other things, the funds to retain a mental-retardation expert. On August 7, 2003, the common pleas court summarily denied the petition and the motions, and Carter appealed.

## I

{¶ 6} In his first assignment of error, Carter contends that the common pleas court erred in denying his motion for funds for a mental-retardation expert and in denying his postconviction petition without an evidentiary hearing. We agree.

### A. *Atkins* and *Lott*

{¶ 7} On June 20, 2002, the United States Supreme Court ruled in *Atkins v. Virginia* [7] that executing a mentally retarded individual violates the Eighth Amendment's proscription against cruel and unusual punishment. Having declared the principle, the court " 'le[ft] to the State[s] the task of developing appropriate ways to enforce the constitutional restriction.' " [8] Because the state of Virginia had disputed Atkins's claim of mental retardation, the court remanded to the state court the issue of whether Atkins was "so impaired as to fall within the range of mentally retarded offenders [against] who[se] [execution] there [had emerged] a national consensus." [9]

{¶ 8} On December 11, 2002, the Supreme Court of Ohio in *State v. Lott* [10] undertook the task of developing the procedures for enforcing the Eighth Amendment's proscription against executing the mentally retarded and the substantive standards for adjudicating a capital defendant's claim that he is mentally retarded. The court declared that "[t]he procedures for postconviction relief outlined in R.C. 2953.21 et seq. provide[d] a suitable statutory framework for reviewing [an] *Atkins* claim." [11]

{¶ 9} The court in *Lott* acknowledged that the Supreme Court in *Atkins* had recognized a new federal right that applied retrospectively to convicted murder-

---

7. *Atkins v. Virginia* (2002), 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335.

8. Id., 536 U.S. at 317, 122 S.Ct. 2242, 153 L.Ed.2d 335 (quoting *Ford v. Wainwright* [1986], 477 U.S. 399, 405, 106 S.Ct. 2595, 91 L.Ed.2d 335).

9. Id., 536 U.S. at 317, 122 S.Ct. 2242, 153 L.Ed.2d 335.

10. *State v. Lott,* 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011.

11. Id. at ¶ 13.

ers facing the death penalty.[12]  Thus, a petitioner who had been sentenced to death before the Supreme Court's decision in *Atkins* could seek review of his *Atkins* claim in a late or successive postconviction petition by invoking the jurisdiction conferred under R.C. 2953.23.[13]

{¶ 10} But the court in *Lott* recognized that a defendant who had been sentenced to death before the decision in *Atkins* had not had a full and fair opportunity to litigate a claim of mental retardation as a complete bar to the death penalty.[14]  Thus, the court viewed a postconviction petition "filed for the first time since *Atkins* [had] established the new standard for mental retardation * * * [to be] more akin to a first petition than a successive petition for postconviction relief." [15]  This consideration prompted the court to conclude that the doctrine of "res judicata d[id] not bar [a postconviction *Atkins* ] claim," and that "due process *now* require[d] consideration of [a capital defendant's] evidence of mental retardation before he is executed." [16]  (Emphasis sic.)  Moreover, the court elected to depart from R.C. 2953.23 by granting a petitioner who had been sentenced to death before its decision in *Lott* 180 days from the date of the decision to present his postconviction *Atkins* claim.  Thereafter, a petitioner could seek review of his *Atkins* claim in a late or successive postconviction petition only if, with certain qualifications, he had satisfied the jurisdictional requirements of R.C. 2953.23.[17]

{¶ 11} The court in *Lott* looked to the clinical definitions of mental retardation, cited with approval by the Supreme Court in *Atkins*, to provide three criteria for

---

12.  See id. at ¶ 17;  see, also, *Hill v. Anderson* (C.A.6, 2002), 300 F.3d 679, 681.

13.  R.C. 2953.23(A), as it provided in June 2003 when Carter filed his petition, permitted a common pleas court to entertain a late or successive postconviction petition if "[s]ubsequent to the period prescribed in [R.C. 2953.21(A)(2)] or to the filing of an earlier petition, the United States Supreme Court [had] recognized a new federal or state right that applie[d] retroactively to persons in the petitioners situation, and the petition assert[ed] a claim based on that right[,][and][t]he petitioner show[ed] by clear and convincing evidence that, but for constitutional error at trial, no reasonable factfinder would have found the petitioner guilty of the offense of which the petitioner was convicted or, if the claim challenges a sentence of death that, but for constitutional error at the sentencing hearing, no reasonable factfinder would have found the petitioner eligible for the death sentence."

14.  See *State v. Lott*, supra, at ¶ 20.

15.  Id. at ¶ 17.

16.  Id. at ¶ 20.

17.  See id. at ¶ 24.  The court softened the R.C. 2953.23(A)(2) requirement that a "petitioner [challenging a death sentence] show[ ] by clear and convincing evidence that * * *, but for constitutional error at the sentencing hearing, no reasonable factfinder would have found the petitioner eligible for the death sentence."  The court instead determined that the common pleas court should apply a "preponderance-of-the-evidence standard."  *Lott,* supra, at ¶ 17.

evaluating a capital defendant's claim that he is mentally retarded.[18] The court determined that the clinical definitions required the defendant to demonstrate "(1) significantly subaverage intellectual functioning, (2) significant limitations in two or more adaptive skills, such as communication, self-care, and self-direction, and (3) onset before the age of 18." [19]

{¶ 12} The court in *Lott* cautioned that an IQ test score is merely one measure of intellectual functioning that "alone [is] not sufficient to make a final determination on [the mental-retardation] issue." [20] But the Supreme Court in *Atkins* had based its holding, in part, upon what it saw as a "national consensus" against executing the mentally retarded that had emerged from the growing number of state statutes that prohibited the practice.[21] And the court in *Lott*, pursuing a similar line of reasoning, looked to those statutes, saw that "[m]ost" of the statutes "require[d] evidence that the individual ha[d] an IQ of 70 or below," and thus held that an IQ score above 70 gave rise to "a rebuttable presumption that a defendant [was] not mentally retarded." [22]

{¶ 13} The court in *Lott* contemplated that a common pleas court would conduct its mental-retardation inquiry "in a manner comparable to" an inquiry into a question of competency. Thus, the court imposed upon the defendant the burden of establishing that he was mentally retarded by a preponderance of the evidence and committed the determination of mental retardation to the common pleas court, rather than to a jury. Further, the court instructed the common pleas court to "rely on professional evaluations of [the defendant's] mental status, and [to] consider expert testimony, appointing experts if necessary." Finally, the court required the common pleas court to memorialize the bases for its decision in the form of written findings.[23]

### B. The Postconviction Petition

{¶ 14} Carter presented his *Atkins* claim in a postconviction petition filed within 180 days from the date of the Supreme Court's decision in *Lott.* Therefore,

---

18.  See *State v. Lott*, supra, at ¶ 18; see, also, *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335, fn. 3 (citing definitions from the American Association of Mental Retardation and the American Psychiatric Association).

19.  *State v. Lott*, supra, at ¶ 12.

20.  Id.

21.  See *Atkins v. Virginia*, 536 U.S. at 317, 122 S.Ct. 2242, 153 L.Ed.2d 335.

22.  *State v. Lott*, supra, at ¶ 12.

23.  Id. at ¶ 18 and 21.

the common pleas court had jurisdiction to entertain his petition under R.C. 2953.21.

{¶ 15} R.C 2953.21(A)(1) requires a postconviction petitioner to demonstrate a denial or infringement of his rights in the proceedings resulting in his conviction that have rendered the conviction void or voidable under the Ohio Constitution or the United States Constitution. In advancing such a claim, the petitioner bears the initial burden of demonstrating, through the petition and any supporting affidavits and the files and records of the case, "substantive grounds for relief." [24]

{¶ 16} A postconviction claim is subject to dismissal without a hearing if the petitioner has failed to submit with his petition evidentiary material setting forth sufficient operative facts to demonstrate substantive grounds for relief.[25] Conversely, "the court shall proceed to a prompt hearing on the issues" if "the petition and the files and records of the case show the petitioner is * * * entitled to relief." [26]

{¶ 17} To the extent that Carter's first assignment of error is directed against the denial of his motion for funds to retain a mental-retardation expert, it presents, in essence, a challenge to the common pleas court's failure to permit discovery. We have long held that the postconviction statutes do not contemplate discovery in the initial stages of a postconviction proceeding.[27] But Carter was entitled to discovery to develop his claim, including the experts necessary to aid in that discovery and to assist in presenting the claim, if the petition and its supporting evidentiary material demonstrated substantive grounds for relief.[28]

{¶ 18} Carter's intellectual limitations were explored as a possible mitigating factor during the penalty phase of his trial.[29] To facilitate that inquiry, the trial court had appointed a clinical psychologist to examine Carter, who was then 19 years old. The psychologist testified at the sentencing hearing that, as a small child, Carter had been slow to reach some developmental milestones, that he had

---

24. R.C. 2953.21(C).

25. See id.; *State v. Pankey* (1981), 68 Ohio St.2d 58, 22 O.O.3d 262, 428 N.E.2d 413; *State v. Jackson* (1980), 64 Ohio St.2d 107, 18 O.O.3d 348, 413 N.E.2d 819.

26. R.C. 2953.21(E).

27. See *State v. Zuern* (Dec. 4, 1991), 1st Dist. Nos. C–900481 and C–910229, 1991 WL 256497; accord *State v. Byrd* (2001), 145 Ohio App.3d 318, 332–333, 762 N.E.2d 1043.

28. See *State v. Issa* (Dec. 21, 2001), 1st Dist. No. C–000793, 2001 WL 1635592.

29. R.C. 2929.04(B)(3) provided then, as it provides now, that a court must weigh against the aggravating factors the mitigating factor of "[w]hether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law."

needed speech therapy, and that he had been hospitalized for a serious medical problem at the age of four. Between the ages of five and nine, Carter had performed "relatively well" in school, receiving As, Bs, and Cs. But on the Wechsler Intelligence Scale for Children, administered when he was 12, Carter received a full scale IQ score of 76, thus displaying "an intellectual ability in the range of borderline mentally retarded." The psychologist speculated that the disparity between Carter's school performance and his IQ score may have been attributable to "a learning disability and some sort of dysfunction in [his] brain." During his grade-school years, Carter was also physically clumsy, and his peers viewed him as a "slow learner" and teased him about his "limited intellectual ability," making it difficult for him to make friends.

{¶ 19} By the age of 13, Carter's academic performance had dropped precipitously. He wanted to drop out of school then, but, at his mother's urging, he remained in school until he was 16. Those and the ensuing years were marked by drug and alcohol abuse, thefts, physically abusive behavior toward people and animals, anger- and impulse-control problems, and problems with finding and keeping a job. Also, several times in each of the years between the ages of 12 and 19, Carter sustained injuries that required emergency-room treatment, and, during that period, he underwent outpatient psychiatric treatment.

{¶ 20} In the course of his evaluation for sentencing, Carter displayed a "limited ability to read and write." As part of his evaluation, he took an IQ test. But the test results were invalidated upon the test administrator's suspicion that Carter had given false responses.

{¶ 21} Upon the information before him, the psychologist concluded that Carter was "borderline mentally retarded with limited intellectual ability" that placed him "in the bottom 5 percent of the nation intellectually." He further concluded that Carter was "substance dependent," and that he suffered from an "anti-social personality," evidenced by "alienation" and "difficulty" in his personal relationships and by being "easily led by others."

{¶ 22} The evidence adduced during the penalty phase of Carter's trial concerning his intellectual limitations certainly was relevant to the common pleas court's postconviction inquiry into Carter's *Atkins* claim. But the inquiry at Carter's sentencing hearing was directed at determining whether, for purposes of mitigation, Carter, "at the time of committing the offense, * * * because of a mental disease or defect, [had] lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law." [30] It was not intended to probe the issue, presented by Carter's *Atkins*

---

30. R.C. 2929.04(B)(3).

claim, of whether he was so impaired that his execution would constitute cruel and unusual punishment.

{¶ 23} In support of his *Atkins* claim, Carter offered Social Security Administration records, the report of the Hamilton County Justice Center's staff psychiatrist, and the affidavit of a psychologist experienced in assessing and treating mentally retarded and developmentally disabled individuals. The Social Security Administration records showed that, in 1992, Carter had been deemed eligible for supplemental security income based upon a psychologist's determination in 1986, when Carter was 13, that he was mentally retarded. The justice-center psychiatrist found that Carter had "likely" suffered from learning disabilities as a child; that he had exhibited "demonstrable cognitive limitations" and "limited intellectual abilities" that might have been attributable to a head injury sustained in early adolescence or to his heavy substance abuse as a teenager; that he had also exhibited an "antisocial personality disorder along with features of sadistic personality disorder"; and that "[d]iagnoses [had] appear[ed] to be most consistent with probable mental retardation[,] * * * attention deficit disorder[,] * * * and organic impairment." Finally, the psychologist with expertise in mental retardation reviewed the trial record, the Social Security Administration records, and the justice center psychiatrist's report in light of the American Psychiatric Association's definition of "mental retardation" and found them to contain "strong indications of mental retardation" that warranted "further testing."

{¶ 24} In support of its motion to dismiss Carter's postconviction petition, the state offered those parts of the trial record that suggested that Carter did not meet the criteria for mental retardation established in *Lott* and a printout from Carter's personal website. The website, the state asserted, showed Carter's "written communication skills with a well thought out and deliberately worded essay seeking a pen pal" and displayed "artwork [that] reflect[ed] a depth of human expression and communication that belie[d] his claim of * * * limited mental capabilities."

{¶ 25} Carter's postconviction petition, with its supporting affidavits and the files and records of the case, presented factual issues as to whether he has, since before the age of 18, suffered from "significantly subaverage intellectual functioning" and "significant limitations in two or more adaptive skills" such that he cannot, consistent with the Eighth Amendment, be executed. Having thus sustained his burden of demonstrating substantive grounds for relief, Carter is entitled to a hearing on his postconviction claim and to discovery and the expert assistance needed to develop and present his claim.[31]

---

31. See R.C. 2953.21(E); see, also, *State v. Lott,* supra, at ¶ 22 (holding that the "disputed factual issue" of whether the defendant was mentally retarded required a remand to afford the

{¶ 26} We, therefore, hold that the common pleas court erred when it dismissed Carter's petition without a hearing. Accordingly, we sustain the first assignment of error.

## II

{¶ 27} In his second assignment of error, Carter contends that the common pleas court erred in failing to appoint a mental-retardation expert. In his third assignment of error, he contends that the court denied him his due-process, equal-protection, and Eighth Amendment rights when it presumed that he was not mentally retarded based on his IQ score of over 70. And in his fourth assignment of error, he challenges the denial of his motion for a jury determination of the mental-retardation issue. Our disposition of the first assignment of error renders moot the challenges presented in the second, third, and fourth assignments of error. We, therefore, do not reach the merits of those challenges.[32]

## III

{¶ 28} Upon our determination that the common pleas court erred when it dismissed Carter's postconviction petition without a hearing, we reverse the judgment entered below and remand this cause for further proceedings consistent with the law and this decision.

Judgment reversed
and cause remanded.

WINKLER, P.J., and PAINTER, J., concur.

---

defendant an opportunity to present additional evidence and to permit the trial court to resolve the issue).

32. See App.R. 12(A)(1)(c).