*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 13a0353a.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT
_____

JAMES O'NEAL,

       *Petitioner-Appellant,*

    *v.*

MARGARET BAGLEY, Warden,

         *Respondent-Appellee.*

No. 11-3449

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 1:02-cv-00357—Michael R. Barrett, District Judge.

Argued: June 11, 2013

Decided and Filed:  December 23, 2013

Before:  MERRITT, COLE, and McKEAGUE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Kirstie N. Young, BIESER, GREER & LANDIS, LLP, Dayton, Ohio, for Appellant.  Brenda S. Leikala, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Kirstie N. Young, Michasel W. Krumholtz, BIESER, GREER & LANDIS, LLP, Dayton, Ohio, Lawrence J. Greger, GREGER LAW OFFICE, Dayton, Ohio, for Appellant.  Brian S. Deckert, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

COLE, J., delivered the opinion of the court, in which McKEAGUE, J., joined. MERRITT, J. (pp. 18–21), delivered a separate dissenting opinion.

_____

## AMENDED OPINION

_____

COLE, Circuit Judge.  A jury convicted James O'Neal of the aggravated murder of his wife, and a state trial court sentenced him to death at the jury's recommendation. The Ohio courts affirmed his conviction and sentence on direct review and denied post-

conviction relief. O'Neal then filed a petition for habeas corpus in federal court, which the district court denied. We affirm.

I.

In September 1993, James O'Neal moved into a house in Cincinnati, Ohio, with his wife Carol O'Neal, her four children, all from prior relationships, and his two sons, also from prior relationships. The house was leased in Carol's name from a private landlord with rental assistance provided by the Hamilton County Section 8 Program. The lease identified Carol as "the Tenant" and Carol's children along with James as "occupants," but said nothing of James's children. The house was crowded to be sure, and perhaps for this reason, the arrangement did not last for long. On December 7, 1993, a physical altercation between James and Carol ended with Carol kicking James and his sons out of the house. She later filed a domestic complaint and made plans to change the locks. While it is unclear where the boys went from there, it is undisputed that James took to the streets. He left behind some clothes and personal effects, but made no attempt to retrieve them.

On December 11, 1993, James returned to the house bent on "teach[ing] [Carol] a lesson" for kicking his sons out. He broke through a portion of the front door and, once inside, followed Carol to an upstairs bedroom. There he fired three shots at Carol, one of which fatally wounded her. Carol's son Ricardo alleged that James attempted to shoot him as well but gave up when the gun jammed. James fled the house. A police canine unit found him later that evening hiding in a nearby house where he surrendered. In a statement given to the police, James acknowledged that he had fought with Carol, that she had subsequently kicked him and his sons out of the house, and that he had been living on the streets ever since. He then confessed to returning to the house and shooting Carol. A forensic examination eventually linked the bullet removed from Carol's body to the pistol in James's possession at the time of his surrender.

James was indicted for purposely causing Carol's death during the commission of an aggravated burglary, for purposely causing her death with prior calculation and design, for the attempted murder of Ricardo, and for aggravated burglary. The

indictment included four firearms specifications and two death-penalty specifications, including one for murder during an aggravated burglary. The state trial court, however, dismissed the charges and death-penalty specification relating to aggravated burglary on the basis of spousal privilege. The trial court ruled that Ohio law precluded liability for the lesser included offense of criminal trespass because one spouse could not exclude the other from the marital home. The state appellate court reversed the trial court's decision after holding that spousal privilege was limited to civil matters and did not affect criminal liabilities. *State v. O'Neal*, 658 N.E.2d 1102, 1103-04 (Ohio Ct. App. 1995) (*O'Neal I*).

A trial ensued, and the jury convicted James on both counts of aggravated murder, each accompanied by a death-penalty specification for murder during an aggravated burglary, one count of aggravated burglary, and three firearms specifications. On direct review, the Supreme Court of Ohio affirmed his conviction and sentence under *State v. Lilly*, 717 N.E.2d 322 (Ohio 1999), an intervening decision in which the state supreme court conclusively established that spousal privilege "is inapplicable in criminal cases," *id.* at 325. The court held that James was properly convicted of aggravated burglary because he had committed a trespass against property that "was in Carol's sole custody and/or control" at the time of the murder. *State v. O'Neal*, 721 N.E.2d 73, 82 (Ohio 2000) (*O'Neal II*). James then sought post-conviction relief, which the Ohio courts denied. He also filed a motion for reconsideration and a post-conviction petition raising the issue of mental retardation under the United States Supreme Court's recent decision in *Atkins v. Virginia*, 536 U.S. 304 (2002), both to no avail.

In 2002, James filed a federal petition for habeas corpus, which raised eighteen claims for relief in its amended form. The district court rejected the petition because he had procedurally defaulted a number of claims and the rest failed on the merits. The district court granted a certificate of appealability on four of those claims, which we address in turn.

II.

O'Neal first claims that the Supreme Court of Ohio violated his constitutional right to due process by retroactively applying a novel construction of "spousal burglary law" on direct review to unexpectedly reach his conduct. Specifically, he claims that the state supreme court's decision in *Lilly* subsequently enlarged the scope of the aggravated burglary statute, depriving him of fair warning of what constituted the crime at the time of the offense. A favorable outcome on this point would render him ineligible for the death penalty.

A.

Before we address the merits of O'Neal's claim, we must first establish the appropriate standard of review. We generally review a district court's denial of a federal habeas petition de novo. *Murphy v. Ohio*, 551 F.3d 485, 493 (6th Cir. 2009). However, where, as here, the petitioner filed his petition after the effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), we may grant relief on claims "adjudicated on the merits in State court proceedings" only if the challenged adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," 28 U.S.C. § 2254(d)(1), or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented" to the relevant state court, *id.* § 2254(d)(2).

The threshold question is whether O'Neal's due process claim was adjudicated on the merits in the state courts. O'Neal presented his claim in various forms—though couched in state-law terms—to the state appellate court and the state supreme court on direct review, where it failed to gain traction. He first invoked U.S. Supreme Court precedent and the federal Constitution in a motion for reconsideration to the state supreme court. That court denied the motion without comment. The parties agree that his claim had been adequately presented by this point, meaning that the denial operates as an adjudication on the merits for § 2254(d) purposes in the absence of an alternative theory from O'Neal. *See Harrington v. Richter*, 131 S. Ct. 770, 784-85 (2011) ("When

a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." (citation omitted)). But O'Neal has advanced no such theory, and he even conceded in his briefs and again at oral argument that the denial of his motion for reconsideration ultimately rested on substantive rather than procedural grounds. Because the presumption of a merits determination was never rebutted, we have little choice but to apply the deferential standard of review prescribed by AEDPA.

Accordingly, O'Neal is entitled to relief only if the Supreme Court of Ohio's decision contradicted or unreasonably applied clearly established federal law. 28 U.S.C. § 2254(d)(1). In other words, he must show that the challenged decision rested on "an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 131 S. Ct. at 786-87. This he cannot do.

B.

Under AEDPA, we look to the law as it stood on the date the Supreme Court of Ohio adjudicated O'Neal's claim. *See Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). The most important precedent is *Bouie v. City of Columbia*, 378 U.S. 347 (1964). In *Bouie*, the U.S. Supreme Court articulated a general principle of fair warning inherent in the Due Process Clause. This principle holds that retroactively "applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope" is incompatible with the demands of due process. *United States v. Lanier*, 520 U.S. 259, 266 (1997) (citations omitted). It is in many respects the judicial counterpart to Article I's Ex Post Facto Clause. *See Bouie*, 378 U.S. at 353-54. The crucial test is "whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct" could be criminally penalized. *Lanier*, 520 U.S. at 267; *see Bouie*, 378 U.S. at 353-55. Thus, a defendant's due process rights are violated when a court applies a construction of the statute that "is unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue." *Bouie*, 378 U.S. at 354

(internal quotation marks and citation omitted).  Our task is to decide whether the Supreme Court of Ohio contradicted or unreasonably applied the law declared in *Bouie* and its progeny in rejecting O'Neal's due process claim.

We begin with the relevant statutory language and the manner in which it had been construed by the Ohio courts prior to the events in question.  The jury convicted O'Neal of, among other things, aggravated murder with an aggravated burglary death-penalty specification, the latter of which is the nub of this appeal.  The offense of aggravated burglary is defined by statute in Ohio:

> (A) No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:
>
> (1) The offender inflicts, or attempts or threatens to inflict physical harm on another;
>
> (2) The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control.

Ohio Rev. Code Ann. § 2911.11(A).  This provision makes clear that one of the essential elements of the offense is a "trespass."  A separate statutory provision, in turn, defines a trespass as knowingly intruding on the land or property of another "without privilege to do so."  *Id.* § 2911.21(A)(1).  O'Neal argues that his entry into the house was not "without privilege" based on yet another statutory provision.  That one, located in a portion of the Ohio Code entitled "Domestic Relations," notes that "[n]either husband nor wife . . . can be excluded from the other's dwelling, except upon a decree or order of injunction made by a court of competent jurisdiction."  *Id.* § 3103.04.  The gist of O'Neal's claim is that, at the time of the murder, he could not have also committed the offense of aggravated burglary because spousal privilege precluded him from committing the lesser included offense of criminal trespass.

But the Ohio courts had not then settled on a definitive construction of the intersecting and seemingly contradictory statutory provisions.  After the aggravated

burglary statute passed in 1974 and before December 1993, the state appellate courts issued a number of discordant decisions. On the one hand, O'Neal relies on two decisions that categorically held "'one spouse cannot be criminally liable for trespass in the dwelling of the other.'" *State v. Middleton*, 619 N.E.2d 1113, 1116 (Ohio Ct. App. 1993) (quoting *State v. Herder*, 415 N.E.2d 1000, 1004 (Ohio Ct. App. 1979)). Both invoked the unqualified nature of spousal privilege in adopting a narrower construction of the trespass provision. On the other hand, the state relies on two contemporaneous decisions in which the state appellate courts declined to apply spousal privilege in the criminal context. *State v. Herrin*, 453 N.E.2d 1104 (Ohio Ct. App. 1982); *State v. Winbush*, 337 N.E.2d 639 (Ohio Ct. App. 1975). Both courts suggested instead that under certain circumstances, including when violence or force is used, a husband out of possession could be found guilty of trespass or burglary for entering the marital home without his wife's permission. Thus, when O'Neal acted, it was at least ambiguous whether spousal privilege precluded criminal liability for trespass (and, by extension, aggravated burglary) in the marital home all of the time, some of the time, or none of the time.

By 1995, however, the Ohio courts had decisively rejected any notion that spousal privilege barred criminal liability. In the instant case, on appeal from the trial court's dismissal of the aggravated burglary charges and specifications against O'Neal, the state appellate court held that a conviction for trespass or burglary was possible if one spouse had established "sole possessory interest in the [marital] house" at the time. *O'Neal I*, 658 N.E.2d at 1104 (noting that spousal privilege is not "equally applicable to a criminal case and a civil case"). Four years later, the Supreme Court of Ohio took up the issue for the first time in a different case. *Lilly*, 717 N.E.2d at 325 ("This case presents the court with the question of whether [Ohio Rev. Code Ann. §] 3103.04 precludes prosecution of one spouse for burglary committed in the residence of the other spouse."). The state supreme court held once and for all that spousal privilege "is inapplicable in criminal cases." *Id.* It then announced a new rule—that "a spouse may be criminally liable for trespass and/or burglary in the dwelling of the other spouse who is exercising custody or control over that dwelling." *Id.* The state supreme court later

upheld O'Neal's conviction on direct review applying *Lilly*'s rule.  *See O'Neal II*, 721 N.E.2d at 81-82.

O'Neal now argues that doing so violated his due process rights by retroactively expanding the aggravated burglary statute to reach his conduct.  There might even be something to his claim given a fresh review.  However, as a habeas court, we have no such opportunity, nor can we say that it was unreasonable for the Supreme Court of Ohio to conclude that applying *Lilly* retroactively did not deprive O'Neal of his right to fair warning by working an impermissible change in the law.  And this is enough to doom his claim under the exacting standard imposed on us by 28 U.S.C. § 2254(d)(1).

This case bears only a faint resemblance to *Bouie*, in which the U.S. Supreme Court held that South Carolina violated the defendants' due process rights by retroactively applying a new interpretation of a trespass statute that criminalized "the act of remaining on the premises of another after receiving notice to leave," 378 U.S. at 350, though the statute on its face required "proof of notice before entry," *id.* at 356.  For starters, the decision in question here did not expand the scope of criminal liability beyond the contours of previous judicial interpretation. *Cf. id.* ("The interpretation given the statute by the South Carolina Supreme Court . . . has not the slightest support in prior South Carolina decisions.").  As we have noted, two prior state appellate court decisions raised the possibility that a defendant found to have broken into the marital home by force without the permission of the spouse exercising control of the home would be guilty of a trespass or more.  *Herrin*, 453 N.E.2d at 1106 ("When defendant forcibly entered the residence without his wife's permission [and in spite of a court order], he 'trespassed.'"); *Winbush*, 337 N.E.2d at 641 ("Although a husband has a possessory interest in the abode of his spouse and, therefore, may not be found guilty of simple trespass where no violence is involved because of his right to be there, he may not use violence to enforce his possessory interest.  In other words, one spouse may not use violence to enter the abode of the other.").  Both decisions suggested that spousal privilege had limited currency in the criminal context.  Thus, when the Supreme Court of Ohio resolved the uncertainty evident in the state appellate courts as it did in *State v.*

*Lilly*, 717 N.E.2d at 325-28, its new construction was not "unexpected and indefensible by reference to [existing] law," *Bouie*, 378 U.S. at 354, even if the custody-and-control rule was not inevitable.

Nor did the Supreme Court of Ohio stretch the terms of a criminal statute beyond recognition. *Cf. id.* at 352 (holding that an "unforeseeable . . . judicial expansion of narrow and precise statutory language" deprives a defendant of due process). The plain language of the aggravated burglary statute applies with equal force to all types of persons, including spouses, Ohio Rev. Code Ann. § 2911.11(A), as does the plain language of the criminal trespass statute, *id.* §§ 2911.21(A)(1), (E). Thus, the statutes by their terms "made it reasonably clear at the relevant time" that O'Neal's entry into the house was criminal. *Lanier*, 520 U.S. at 267. It is true enough that the spousal-privilege statute is drawn in equally categorical terms, which pull in precisely the opposite direction. Ohio Rev. Code Ann. § 3103.04. But nothing on the face of that statute, located in the "Domestic Relations" portion of the Ohio Code, suggests that it modifies criminal liability. When the state supreme court decided *Lilly*, it merely clarified the relationship between these provisions and gave effect to the plain terms of each. 717 N.E.2d at 326-27. In so doing, it did not impermissibly expand "narrow and precise statutory language." *Bouie*, 378 U.S. at 352.

Our conclusion is also consistent with U.S. Supreme Court precedent of more recent vintage. In *Metrish v. Lancaster*, 133 S. Ct. 1781 (2013), the Court encountered a situation remarkably parallel to the one before us. The defendant in that case admitted to killing his girlfriend in 1993 and intended to assert a diminished-capacity defense that was then on the books in the state appellate courts. *Id.* at 1785. However, by the time of his retrial in 2005, "the Michigan Supreme Court had [recently] disapproved the series of Michigan Court of Appeals decisions recognizing the diminished-capacity defense," preventing him from utilizing it. *Id.* (internal quotation marks, alterations, and citation omitted). The defendant was convicted of murder and subsequently raised a *Bouie* claim in his habeas petition, which the Court rejected. The Court explained that it had "never found a due process violation . . . where a state supreme court, squarely addressing a

particular issue for the first time, rejected a consistent line of lower court decisions based on the supreme court's reasonable interpretation of the language of a controlling statute." *Id.* at 1792. This passage would seem to compel the same result here. As in that case, *Lilly* represents the Supreme Court of Ohio's first and only foray into the split among lower state courts that had offered competing glosses on the aggravated burglary and criminal trespass statutes. Its rejection of the gloss favoring spousal privilege was based on a reasonable interpretation of the underlying statutes. In light of *Lancaster*, we cannot fault the reasonableness of the Supreme Court of Ohio's determination that retroactively applying *Lilly* did not violate O'Neal's due process rights.

Like *Lancaster*, this is ultimately a case about deference. O'Neal may or may not have a colorable claim that he was deprived of due process. But it is not sufficient for O'Neal to show merely that his application of the relevant U.S. Supreme Court precedent is more plausible than the state court's application—he must demonstrate that precedent requires his preferred outcome. Because fairminded disagreement as to whether *Lilly* represented an "unexpected and indefensible" development in the law remains possible, *Bouie*, 378 U.S. at 354, he cannot carry that burden. Our only choice is to affirm. *See Harrington*, 131 S. Ct. at 784-85.

### III.

O'Neal separately claims that the state presented insufficient evidence to support his aggravated burglary conviction. He identifies two types of privilege—contractual and spousal—that he says preclude a finding of guilt on the element of trespass. O'Neal adds that, in any event, the evidence shows he had "a right to custody and control" of the house under *Lilly*. We disagree.

It is axiomatic that a criminal conviction must be supported by evidence that leaves no reasonable doubt about the defendant's guilt. *Jackson v. Virginia*, 443 U.S. 307, 316-18 (1979). Our task is to determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319 (emphasis in original). Because the Supreme Court of Ohio ruled on the merits, we may not grant

relief on this claim unless its conclusion was objectively unreasonable.   28 U.S.C. § 2254(d)(1); *see Sanborn v. Parker*, 629 F.3d 554, 577 (6th Cir. 2010).

Here, the Supreme Court of Ohio reasonably rejected O'Neal's claim.  When construed in favor of the prosecution, the evidence presented at trial was sufficient for "a rational trier of fact" to find the essential elements of aggravated burglary, including trespass, beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319.  First, nowhere is O'Neal identified as a tenant of the house in which he killed his wife, suggestive of an unqualified privilege to enter.  A housing assistance payments contract—introduced (mistakenly) at trial as the lease—lists only Carol as the "family representative."  It says nary a word about O'Neal.  This fact does not stop him from making a convoluted argument that he was a tenant by virtue of his status as a family member, but that argument is tenuous at best.  Even the actual lease, which was not brought in until the post-conviction proceedings, clearly identifies Carol as the tenant and O'Neal as merely an occupant.  Based on the evidence presented at trial, a jury could have reasonably found that O'Neal had no contractual privilege to enter the house on the day of the murder.  Second, a jury could have just as reasonably found that Carol exercised sole custody and control over the house at the time of her murder. *See Lilly*, 717 N.E.2d at 325.  Carol's children and a responding police officer all testified that she had kicked O'Neal and his sons out of the house four days earlier.  In addition, Carol had filed a domestic complaint and made plans to change the locks.  O'Neal himself admitted to the police that he no longer lived at the home when he broke through the door and killed Carol, effectively undermining his claim.

To the extent O'Neal's sufficiency claim invokes spousal privilege, it is little more than an attempt to shoehorn his due process claim into a different category, and it fails just the same.

IV.

O'Neal next claims that he received ineffective assistance of counsel during the guilt phase of his trial because his attorney failed to present the actual lease, which

allegedly supported his assertion of contractual privilege, and instead wrongly stipulated that two other, less helpful documents were the lease.  We again disagree.

To succeed, O'Neal must show that his attorney's performance fell "below an objective standard of reasonableness" and that this poor performance caused him prejudice.  *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984); *Williams v. Anderson*, 460 F.3d 789, 800 (6th Cir. 2006).  Prejudice occurs "if a reasonable probability exists that but for [the attorney's poor performance] the outcome of the proceedings would have been different." *Williams*, 460 F.3d at 800.  The state appellate court addressed this claim on the merits and concluded that O'Neal could not demonstrate prejudice.  Because the state court did not unreasonably apply the *Strickland* standard, we cannot grant relief.  28 U.S.C. § 2254(d)(1); *see Brooks v. Bagley*, 513 F.3d 618, 624-25 (6th Cir. 2008).

We too focus on the prejudice prong in rejecting O'Neal's claim.  In Ohio, a trespass is one of the essential elements of aggravated burglary.  Ohio Rev. Code Ann. § 2911.11(A).  A person trespasses when he knowingly intrudes on the land or property of another "without privilege to do so." *Id.* § 2911.21(A)(1).  O'Neal argues that, had his counsel introduced the actual lease into evidence at trial, it would have established that he had a contractual privilege to enter the house.  He makes this point by way of contrast.  As noted above, a housing assistance payments contract and an accompanying addendum were admitted together at trial as the "lease."  They list Carol as the "family representative," name O'Neal's children, but contain no mention of O'Neal himself.  The actual lease, on the other hand, identifies Carol as "the Tenant" and identifies O'Neal along with Carol's children as "occupants."  But the latter is no more helpful.  The mere mention of O'Neal's name would neither have changed the trespass calculus nor resulted in a more favorable outcome.  For one thing, the state court relied on evidence apart from the "lease" to conclude that O'Neal committed aggravated burglary.  The court found that O'Neal took to the streets after Carol kicked him out, that Carol then filed for a protection order, and that O'Neal subsequently entered the house only through the use of force.  *O'Neal II*, 721 N.E. 2d at 82.  Accordingly, whether or not O'Neal was listed

on the lease, the state court found that he had relinquished possession when he left—giving Carol custody and control over the house—such that he trespassed upon his violent return. *Id.* For another thing, the lease does not conclusively prove what O'Neal says it proves—that is, his status as a tenant with a contractual privilege to enter the house. The lease terms only state that he is an "occupant," as opposed to Carol, who is clearly designated as the sole "Tenant."

Thus, O'Neal has not shown a reasonable probability that the outcome of the proceedings would have been different had his counsel introduced the actual lease into evidence.

V.

Finally, O'Neal claims that he is mentally retarded and therefore ineligible for execution under *Atkins v. Virginia*, 536 U.S. 304 (2002). As evidence, O'Neal points to low scores on several IQ tests, significant limitations in his academic and social skills, and school records showing onset before the age of eighteen. The trial court rejected his claim following a post-conviction hearing on the grounds that O'Neal failed to prove that he is mentally retarded by a preponderance of the evidence, as required under Ohio law. Though the state appellate court faulted the trial court for applying an improper IQ standard, it nonetheless affirmed the trial court's determination because it was supported by "reliable, credible evidence," rendering any error "harmless." The latter decision is accorded AEDPA deference as the last reasoned state-court decision on the merits. *See* 28 U.S.C. § 2254(d). Thus, O'Neal is entitled to relief only if he can establish that the state appellate court unreasonably determined the facts in light of the evidence presented to it.[1] *Id.* § 2254(d)(2); *see also id.* § 2254(e)(1) (providing that "a determination of a factual issue made by a State court shall be presumed to be correct" in a subsequent federal habeas proceeding and that the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence").

---

[1] O'Neal does not argue that the state appellate court's decision contradicted or unreasonably applied clearly established federal law. *See* 28 U.S.C. § 2254(d)(1). Therefore, the only standard relevant to this claim is prescribed by § 2254(d)(2).

In *Atkins*, the U.S. Supreme Court held that executing mentally retarded individuals is inconsistent with the Eighth Amendment's prohibition on cruel and unusual punishment.  536 U.S. at 321.  The Court left it to the states to decide how to "enforce [this] constitutional restriction" by defining mental retardation.  *Id.* at 317 (quoting *Ford v. Wainwright*, 477 U.S. 399, 405, 416–17 (1986)).  Ohio subsequently took up that task in *State v. Lott*, 779 N.E.2d 1011 (Ohio 2002).  Borrowing definitions from the American Association of Mental Retardation and the American Psychiatric Association, *Lott* established that an individual is mentally retarded if he has "(1) significantly subaverage intellectual functioning, (2) significant limitations in two or more adaptive skills, such as communication, self-care, and self-direction, and (3) onset before the age of 18."  *Id.* at 1014.  Under *Lott*, capital defendants challenging their executions bear the burden of establishing that they are mentally retarded by a preponderance of the evidence, *id.* at 1015, and the failure to satisfy any one of the three criteria is enough to sink an *Atkins* claim.  *See id.* at 1014 (describing the test for mental retardation as a conjunctive one); *accord State v. Burke*, No. 04AP-1234, 2005 WL 3557641, at *3 (Ohio Ct. App. Dec. 30, 2005) ("An individual must meet all three requirements to satisfy *Lott*'s definition of mental retardation.").  The Supreme Court of Ohio acknowledged that "[w]hile IQ tests are one of the many factors that need to be considered, they alone are not sufficient to make a final determination" on the issue of mental retardation.  *Lott*, 779 N.E.2d at 1014.  Nevertheless, the court adopted a rebuttable presumption that a defendant is not mentally retarded "if his or her IQ is above 70."  *Id.*

The state appellate court relied on factual determinations that O'Neal does not suffer from significantly subaverage intellectual functioning and that he does not have limitations in two or more adaptive skills.  In challenging these determinations, O'Neal says he "met the clinical definition of mental retardation at an early age," and submits several IQ tests and the extensive testimony of clinical psychologist Dr. Robert G. Tureen in support.  The separately administered IQ tests show that O'Neal scored below 70 on three occasions between 1968 and 2004, and only once scored above that bar,

receiving a 71 in 1994.[2]   Such low scores are consistent with "borderline mental retardation," even if they are not conclusive of it.  Dr. Tureen's testimony is more comprehensive than the IQ scores.  After evaluating O'Neal twice, once in 1994 and again in 2004, Dr. Tureen found that O'Neal suffers from "mild cerebral dysfunction," which contributes to his "low level of intellectual function."  From this Dr. Tureen concluded that O'Neal has a "significant limitation in academic skills."  Dr. Tureen also found that O'Neal has little ability "to consider alternative modes of dealing with situations which are stressful or which he finds in some way threatening," which contributes to his "difficulties in adjusting in the world."  This was taken as evidence that O'Neal experiences significant limitations in his social skills as well.  Based on these findings, Dr. Tureen ultimately diagnosed O'Neal as suffering from "mild to borderline mental retardation."

We do not doubt that such evidence may lead reasonable minds to conclude that O'Neal is mentally retarded under Ohio law.  Unfortunately, it is not enough on habeas review that the evidence presented, selectively read, at times supports his mental retardation claim.  O'Neal's case falls apart in the end because he fails to adequately undermine by clear and convincing evidence the state court's factual findings to the contrary.  The IQ scores and Dr. Tureen's testimony generally do not call into question the reams of separate record evidence presented to the state court suggesting that O'Neal falls on the other side of the line drawn in *Lott*.  Reasonable minds could just as easily arrive at a determination that O'Neal is not mentally retarded in light of the record read as a whole, which prevents us from granting relief.  *See* 28 U.S.C. § 2254(d)(2).

The three sub-70 IQ scores are insufficient on their own to prove O'Neal has "significantly subaverage intellectual functioning."  *See Lott*, 779 N.E.2d at 1014–15. It is true that these scores fell below the threshold associated with mental retardation, *see id.*, and, as the state trial court noted, were enough to rebut the presumption that O'Neal is not mentally retarded by virtue of his single above-70 score.  Nevertheless, O'Neal's

---

[2]In 1968, O'Neal scored a 64 on the Wechsler Intelligence Scale for Children.  In 1994, he scored a 71 on a Wechsler IQ test administered by Dr. Chiappone.  In 2004, he scored a 67 on the Wechsler Adult Intelligence Scale and a 63 on the Reynolds intelligence test administered by Dr. Tureen.

claim comes up short because there is significant unrebutted evidence in the record that weighs against him. Dr. David Chiappone, another clinical psychologist who evaluated O'Neal before trial, testified that O'Neal functions at a higher level than his "low IQ" would suggest. Dr. Chiappone accordingly concluded that O'Neal is not mentally retarded. A third clinical psychologist, Dr. W. Michael Nelson III, arrived at the same conclusion after reviewing both evaluations and a host of other records at the state's behest, though he never met with O'Neal face-to-face. Dr. Nelson specifically noted that O'Neal's sub-70 IQ scores do not offset a lack of significant deficits in his adaptive functioning. Such testimony provided a basis for the state court to reasonably determine that O'Neal does not suffer from significantly subaverage intellectual functioning. And without clear and convincing evidence undermining the credibility of Dr. Chiappone and Dr. Nelson, we are not persuaded by O'Neal's attempts to emphasize solely the portions of Dr. Tureen's testimony that support his claim. For better or worse, as a habeas court, we are not in a position to pick and choose which evidence we think is best so long as the presumption of correctness remains unrebutted. *See* 28 U.S.C. § 2254(e)(1).

While O'Neal comes closer to succeeding on the adaptive skills prong, *see Lott*, 779 N.E.2d at 1014, it is not enough to rescue his claim. There can be no doubt that Dr. Tureen's testimony supports O'Neal's contention that he has significant limitations in at least two adaptive skills—academic and social. It is also beyond doubt that Dr. Nelson identified "significant deficits in several conceptual areas" as well as "difficulties in dealing with stressful situations in an effective manner."[3] But Dr. Nelson at the same time noted that O'Neal functions at least in the borderline range of practical adaptive skills. Further, he attributed O'Neal's social limitations to "psychiatric difficulties" like drug abuse and personality disorder rather than "specific intellectual/adaptive behavior deficits." This falls short of the kind of unambiguous evidence needed to clear the high hurdle erected by § 2254(d)(2). Even Dr. Tureen was careful to note that O'Neal presents a close case. With expert testimony split, as it often is, the state court chose to

---

[3]Dr. Chiappone did not directly address O'Neal's adaptive skills because he testified at the mitigation hearing, not the *Atkins* hearing. Although introduced for a different purpose, his testimony from the penalty phase of the trial remains relevant to the *Atkins* claim. *See State v. Bays*, 824 N.E.2d 167, 171 (Ohio Ct App. 2005); *State v. Carter*, 813 N.E.2d 78, 83 (Ohio Ct. App. 2004).

credit Dr. Chiappone and Dr. Nelson over Dr. Tureen, and we cannot say from this vantage that it was unreasonable to do so.

O'Neal ultimately fails to show that the state court's decision was inconsistent with the record.  Because he cannot carry the burden of rebutting the presumed correctness of the state court's decision, he is not entitled to relief on his mental retardation claim.  *See* 28 U.S.C. § 2254(e)(1).

VI.

For these reasons, we affirm.

---

**DISSENT**

---

MERRITT, Circuit Judge, dissenting.  My colleagues in the majority make short shrift of O'Neal's mental retardation defense to his future execution.  They do so very simply by holding that "reasonable minds" could differ on the question of O'Neal's mental retardation.  We are told that under the AEDPA we must accept the state court's conclusion "based on an over-70 IQ score" that "O'Neal does not suffer from significantly subaverage intellectual function." (Op. 16-17.)  This conclusion makes no sense because factual findings of intellectual normality "based on" a single "over-70 IQ score" are completely inconsistent with modern scientific opinion found in the psychiatric literature — the literature that the *Atkins* case requires the state and lower federal courts to apply.[1]  We must apply neutral and objective standards as formulated by the consensus of experts in the field.  Indeed, the Supreme Court in *Atkins* recognized that a single IQ test of 71, such as this one, could not be a proper basis for finding normality.  It stated that the retardation literature considers "that between 1 and 3 percent

---

[1]The Supreme Court makes the general standard for mental retardation plain by quoting two similar paragraphs from the two major scientific organizations that have formulated the standards for mental retardation evaluation, as follows:

> The American Association on Mental Retardation (AAMR) defines mental retardation as follows:  "*Mental retardation* refers to substantial limitations in present functioning.  It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas:  communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work.  Mental retardation manifests before age 18."  Mental Retardation:  Definition, Classification, and Systems of Supports 5 (9th ed. 1992).

> The American Psychiatric Association's definition is similar:  "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas:  communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B).  The onset must occur before age 18 years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system."  Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed. 2000).  "Mild" mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70.  *Id.*, at 42-43.

*Atkins v. Virginia*, 536 U.S. 304, 308 n.3 (2002).

of the population has an IQ between 70 and 75 or lower, which is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition." 536 U.S. at 309 n.4. The only relevant IQ testimony before the Ohio court and this court was that O'Neal's IQ scores were all below 70, taking into account Dr. Robert Tureen's testimony that the one 71 IQ score was something of an outlier. Dr. Tureen, the only psychiatrist who actually testified and administered tests, said that the 71 score was the result of an old Wechsler test which turned out to be 67 when the updated verison was readministered. These facts are never mentioned. The Ohio court and this court seem to simply accept the 71 IQ score and then apply an Ohio presumption of normal intellectual ability if there is one IQ score above 70.

The American Association on Mental Retardation specifically cautions against such a fixed cutoff: "IQ has typically dominated and thus has been overemphasized both in terms of professional decision making and diagnosis . . . . This imbalance between intelligence and adaptive behavior does not represent the current conceptualization of mental retardation." Mental Retardation: Definition, Classification, and Systems of Supports 80 (10th ed. 2002). The most recent edition of the DSM, the American Psychiatric Association's guide to mental disorders, also reflects the current understanding that a broader approach produces a more accurate assessment of mental retardation than a heavy reliance on IQ scores — much less the Ohio court's finding based on one IQ test of 71. The manual states, "Individual cognitive profiles based on neuropsychological testing are more useful for understanding intellectual abilities than a single IQ score." Diagnostic and Statistical Manual of Mental Disorders 37 (5th ed. 2013). A clinical evaluation provides the necessary context for interpreting IQ scores, which cannot be viewed in isolation. *See* Mental Retardation: Definition, Classification, and Systems of Supports 58 ("[A] fixed cutoff for diagnosing an individual as having mental retardation . . . cannot be justified psychometrically.").

The one-test methodology for arriving at a "finding" of no retardation does not comply with the standards established by modern scientific opinion as required by

*Atkins*.  We therefore make a major mistake when we defer to a finding based on one IQ test, as the majority opinion suggests.

The only other evidence that the majority cites for its insistence that we must defer to the "findings" of the state court are the opinions of two mental health experts, neither of whom testified  at the *Atkins* mental retardation hearing, Drs. Nelson and Chiappone.   Dr. Nelson simply filed a short opinion without ever seeing, testing, examining, or observing O'Neal.  This procedure seems contrary to common sense as well as the practice required by the American Association on Mental Retardation stating that rendering an opinion about an individual's adaptive skills depends on personal contact, observation, and interviews. *See* Mental Retardation: Definition, Classification, and Systems of Supports 85-86.

Dr. Nelson, the state prosecutor, and the Ohio court rely on the fact that O'Neal served as a dishwasher, briefly had custody of his children, and served as a Marine to show that he performed well enough in his social adaptive functioning to be regarded as normal.  Dr. Nelson's attitude towards dishwashing as a sign of intellectual functioning and social adaptation is far-fetched.   O'Neal's work with dishes, while perhaps exemplary, did not involve much reasoning, logic, or any skill indicative of strong adaptive behaviors.  Retarded individuals can and do maintain employment and O'Neal was no exception. *See* Diagnostic and Statistical Manual of Mental Disorders 43 (4th ed. 2000).   And his work history as a dishwasher was not without problems — Dr. Nelson ignored the portions of the record that show that his work history was riddled with absenteeism and tardiness. O'Neal's military "skill" is considerably less impressive when one considers that O'Neal went AWOL and was dishonorably discharged.  His temporary custody of his children as a "skill" is no evidence of adaptable social skills.  After all, O'Neal admitted to police that he did not even know where his young children were living and he then killed their mother — not exactly an indication of domestic normality.  This set of facts offered in his uncross-examined opinion hardly rebuts Dr. Tureen's comprehensive testimony.

Dr. Chiappone offered his evidence at the mitigation phase of the original trial. He did not purport to offer evidence concerning mental retardation as a bar to execution under *Atkins* standards. He simply acknowledged that O'Neal had a low level of intellectual ability and did not address adaptive skills or other factors recited in the professional standards relied on in the *Atkins* opinion and developed by the psychiatric profession.

Implicit in the opinion of my colleagues in the majority is the suggestion that they would reach a different conclusion if they did not have to "defer" to the state court's "findings." My view is that the state court's opinion, based mainly on its reliance on its presumption, is a finding so far out of the mainstream of scientific opinion — indeed, directly contrary to scientific opinion — as to deserve no deference. Moreover, the Supreme Court opinion in *Atkins*, as quoted above, appears to say that presuming normality from one IQ test of 71 is improper when the "cut off" of mental retardation is considered to be 75. A state court opinion that defies both modern scientific opinion and applicable language in *Atkins* deserves no deference.

As to the other issues decided by my colleagues in the majority, I agree that O'Neal is not entitled to habeas relief.