IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 96-50477

_____


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

SERGIO HERNANDEZ-FLORES,

Defendant-Appellant.

_____

Appeal from the United States District Court for the
Western District of Texas, El Paso
(EP-94-CR-275-1)

_____

June 26, 1997

Before JOLLY, DUHÉ, and EMILIO M. GARZA, Circuit Judges.

PER CURIUM:[*]


Sergio Hernandez-Flores was convicted of kidnaping a nine-year-old girl. He was also convicted of violating the Mann Act by taking the child from El Paso, Texas, to Mexico with the intent to engage in criminal sexual behavior. He was sentenced to life imprisonment for kidnaping and 99-years of imprisonment for the Mann Act violation. Hernandez challenges both his convictions and his sentences. He first contends that the district court improperly denied his request for a continuance of the trial after

_____

[*]Pursuant to Local Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in Local Rule 47.5.4.

a defense witness became unavailable to testify.  He also maintains that he was denied the opportunity to cross-examine adequately a prosecution witness who received favorable treatment from the government, possibly in exchange for his testimony.  Finally, Hernandez challenges the sentences assessed for both convictions. We hold that Hernandez was properly convicted of both crimes. Although he was properly sentenced for kidnaping, his sentence under the Mann Act exceeded the statutory limits.

I

In January 1994, Hernandez, his wife, and children moved into a trailer in El Paso, Texas, next to the Zavala family.  The victim, Maria Zavala, became friends with the Hernandez children, and often played in Hernandez's trailer.  On February 19, 1994, Maria's mother allowed her to walk with the Hernandez family to a local grocery store.  Instead of going to the grocery store, however, Sergio Hernandez took his family and Maria into Mexico. Once in Mexico, they boarded a train bound for the country's interior.  Hernandez lied to both Maria and his common-law wife, telling them that they were heading back to El Paso.  Maria told Hernandez that she wanted to return home several times during this trip.

The group remained in Mexico for over five months.  During this time, Hernandez repeatedly beat and raped Maria.  He also beat and threatened his pregnant wife.  Eventually, unable to find work in Mexico, Hernandez took his family and Maria back to the United

2

States. They were detained by immigration officials in Tucson, Arizona. Maria told an immigration officer that she had been kidnaped, beaten, and sexually abused.

Hernandez and his common-law wife were charged with kidnaping and transportation of a minor in foreign commerce with the intent that the minor engage in unlawful sexual activity in violation of the Mann Act.

Shortly before the April 15 trial, Hernandez made a motion for continuance, contending that one of his witnesses was unavailable to testify. The motion for continuance was denied, and Hernandez was tried and convicted on both counts, and sentenced to life imprisonment on the kidnaping count, and to 99 years imprisonment for the Mann Act offense.

## II

The defendant contends that the district court improperly restricted his cross-examination of Martin Zavala, Maria's father. Hernandez contends that Mr. Zavala had strong motivation to testify on behalf of the government: He had recently been charged with an felony, for which he could have received over five years imprisonment. Instead, it appears that the charges against him were dropped. Moreover, one of prosecutors helped him remain in the country legally, and helped him find a job. Although Hernandez was allowed to cross-examine the witness about his criminal history, and the fact that the prosecution had helped him find a job, the district court stopped questions regarding the severity of

3

the sentence the father was facing, and whether he had entered into a formal plea agreement.

The district court has broad discretion in restricting the scope of cross-examination. United States v. Fortna, 796 F.2d 724, 734 (5th Cir. 1986). Nonetheless, this court has recently noted that "[a]lthough the district court retains its broad discretion to prevent repetitive and unduly harassing interrogation, a witness's possible biases, prejudices, or 'motivation' are 'subject to exploration at trial, and [are] always relevant as discrediting the witness and affecting the weight of his testimony.'" United States v. Alexius, 76 F.3d 642, 645 (5th Cir. 1996), quoting Davis v. Alaska, 415 U.S. 308, 315, 94 S.Ct. 1105, 1110 (1974).

Because he was facing criminal prosecution, Maria's father had an incentive to provide favorable testimony on behalf of the government. Without deciding if the district court erred by cutting short this cross-examination, we find that any error that may have occurred was harmless. Delaware v. Van Arsdale, 475 U.S. 673, 673-76, 106 S.Ct. 1431, 1432-33 (1986)(Sixth Amendment violation should be reviewed under harmless error standard). An error is harmless if it is clear beyond a reasonable doubt that it did not contribute to the verdict obtained. Alexius, 76 F.3d at 646. There is no doubt that the testimony offered by Martin Zavala did not affect the jury's verdict.

First, although the defendant did not examine Zavala regarding the existence of a plea agreement, he did introduce the fact that

4

one of the prosecutors in the case arranged for Zavala to live and work legally in the United States. Therefore, the jury was informed that the witness had a motive to give favorable testimony for the government. Moreover, as the father of the victim, the witness had the strongest incentive to help the prosecution incarcerate the person he believed victimized his daughter. No doubt this fact was not lost on the jury.

Second, the government's case against Hernandez was compelling. Martin Zavala's testimony provided the prosecution no real assistance in proving the elements of the crimes.

The evidence that Maria was sexually molested in Mexico is overwhelming. Dr. Azalia Martinez conducted a physical examination of Maria after she had returned from Mexico. He testified at length about the evidence of abuse he discovered while examining Maria. The doctor testified that Maria showed many signs of extreme physical and sexual abuse. Graphic photographs were introduced into evidence, assisting the doctor's testimony, and showing the jury the physical manifestations of the abuse. He testified that "[i]t was obvious that this child had been abused." The doctor dramatically concluded that having performed over 350 examinations of female children "Maria was the worst case I've seen of child abuse." This testimony presented exceptionally strong evidence that Maria had suffered sexual abuse.

The victim's testimony was also damning. Maria testified that in Mexico the defendant fondled her and forced her to have

5

specifically described forms of intercourse. She also testified that the defendant beat her with a water hose.

Maria's mother also testified. She began her testimony by describing Maria's home life, telling the jury about Maria's brothers, sisters and father. She testified that Maria was a smart child and a good student. She told the jury about the day Maria disappeared, how she began to worry when Maria did not return, and how she searched for her child, before contacting the sheriff's office to get help. She also testified about receiving a telephone call from Maria, after Maria was safe in the border patrol's custody, and how she began to cry after hearing her daughter's voice. The jury also learned that Maria displayed inappropriate sexual behavior after returning from Mexico, and would "show her private parts" when "she wanted money."

These three witnesses provided the critical testimony in this case. The doctor's testimony established beyond any doubt, that Maria had been subjected to extreme abuse. Maria herself identified Hernandez as her attacker. No doubt, the jury's sympathy and empathy for the victim was enhanced by being able to see her in the courtroom. Finally, Maria's mother provided another glimpse into the damage done by the defendant in this case by providing a view of a grieving parent. She also reinforced that Maria had been abused in Mexico by telling the jury how Maria acted inappropriately after being returned home.

Upon this backdrop, the testimony of Maria's father must be examined. Martin Zavala testified that he had a very close relationship with his daughter, despite being in prison during much of Maria's childhood. This testimony added little to that given by Maria's mother, at most showing that the father loved his daughter.

Zavala further testified that Maria had changed after returning from Mexico. Initially, the father's testimony only reinforced that given by Maria's mother:

Q: Was Maria showing unusual sexual behavior since she came back from Mexico.

A: Yes.

Q: What was she doing?
    . . .
A: <u>I didn't see anything.  It's just that her mother says</u> that -- what she used to do, that she would do to me.

Q: In other words, what she used to do in Mexico, she would do to her mother; it that correct?
    . . .
A: Yes.

The father also testified that the neighbors had complained that "my little girl, Maria, and another one, they were doing -- they were doing [sexual] things with other boys that were younger." He testified that before going to Mexico, Maria was "ignorant" of "sexual things."

At best, the father's testimony only supported the mother's testimony, showing that Maria had been sexually molested in Mexico. This testimony is inconsequential compared to the doctor's testimony, which demonstrated in the most graphic terms that Maria

7

was abused, and Maria's testimony, in which she described how Hernandez beat and raped her.

Finally, Hernandez argues that the father was able to "personalize" Maria for the jury. Maria's mother also testified about Maria's home life, giving the same type of testimony as Mr. Zavala. Moreover, Maria testified at the trial, "personalizing" herself; no doubt her father's testimony added little on this score as well. Because her father's testimony was merely cumulative, any error in not allowing more extensive cross-examination was harmless.

III

Hernandez next contends that the district court committed reversible error by refusing to grant his motion for continuance. Hernandez contends that he intended to call as a witness Jorge Ortiz-Contreras, a store clerk and an unofficial justice of the peace from Mexico. Ortiz was to testify that on three occasions he had seen Maria alone, that she seemed happy, and she never asked for help.

Five days before his trial was to begin, Hernandez learned that Ortiz could not attend the April 15 trial. Ortiz had notified the defense attorney that his mother had become ill and he needed to remain in Mexico for up to thirty days to care for her, but would be able to travel to the United States if the trial was postponed for thirty days.

8

Before a continuance must be granted to allow a defendant to secure a witness's testimony, the defendant must prove that: (a) due diligence has been exercised to obtain the witness's attendance; (b) the witness would tender substantial favorable evidence; (c) the witness is available and willing to testify; and (d) the defendant would be materially prejudiced by the denial. United States v. Rodriquez, 15 F.3d 408, 411 (1994); United States v. Walker, 621 F.2d 163, 168 (5th Cir. 1980). A grant or denial of a continuance is reviewed only for an abuse of discretion. United States v. Alexander, 689 F.2d 808 (5th Cir. 1989). Reversal is required only if a defendant shows that the denial of a continuance seriously prejudiced his case. United States v. Webster, 734 F.2d 1048, 1056 (5th Cir. 1984).

Our review of the record shows that Hernandez exercised due diligence in obtaining the witness's attendance. Furthermore, there is sufficient evidence from which the district court could have concluded that the witness was willing and available to testify. Nonetheless, Hernandez failed to show that the witness was going to present "substantial favorable testimony," and he was not materially prejudiced by the denial of the continuance.

Hernandez failed to show that his witness would provide substantial favorable evidence. The trial court was provided with an affidavit by Roberto Villa, the investigator who had traveled to Mexico and talked with Ortiz. Villa swore that Ortiz would testify that on two occasions Maria came to his store alone to purchase

9

food; that Maria appeared to be happy and showed no signs of physical or emotional abuse; that he had seen Maria play with other children in the village; that he had traveled to Hernandez's home and had seen Maria outside playing with the Hernandez children, and that neither Hernandez nor his common-law wife was home at that time; and, finally, that he would testify that he served as an "alcalde," or unofficial justice of the peace of the community--a position that requires him to contact law enforcement officials in the event he observed criminal activity in the village.

The government introduced specific evidence, which was not contradicted, that Maria did not want to leave El Paso, and that she continually protested being taken. There was uncontradicted evidence that Hernandez took Maria to Mexico with the intention of sexually abusing her, and that he carried out his perverted plan. Ortiz's testimony could not have undermined any of this evidence and testimony. Evidence that a young child did not escape is of little probative quality when that child has been taken into the interior of a foreign country, told that her parents did not love her, and that they were not her "real" parents. Because Ortiz could not have provided Hernandez "substantial favorable testimony," the district court did not abuse its discretion in denying his continuance motion.

IV

Hernandez contends the prosecution failed to prove the conduct charged in the Mann Act indictment. The indictment provided: "On

10

or about February 18, 1994 . . . the Defendant . . . knowingly transported [a minor child], in foreign commerce, from El Paso County, Texas, to Mexico, with the intent that such juvenile would engage in sexual activity that would constitute, in the State of Texas, the criminal felony offense of Aggravated Sexual Assault . . . ."[1]  Hernandez maintains that at most, the prosecution proved that he raped the victim while in Mexico, and therefore it was not shown that he could have been charged with violating the Texas Aggravated Sexual Assault statute.  This contention is without merit.

---

[1]Section 2423 of the Mann Act provides:

2423. Transportation of minors

   (a) Transportation with intent to engage in criminal sexual activity.--A person who knowingly transports any individual under the age of 18 years in interstate or foreign commerce, or in any Territory or Possession of the United States, with intent that such individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense, shall be fined under this title or imprisoned not more than ten years, or both.

   (b) Travel with intent to engage in sexual act with a juvenile.--A person who travels in interstate commerce, or conspires to do so, or a United States citizen or an alien admitted for permanent residence in the United States who travels in foreign commerce, or conspires to do so, for the purpose of engaging in any sexual act (as defined in section 2246) with a person under 18 years of age that would be in violation of chapter 109A if the sexual act occurred in the special maritime and territorial jurisdiction of the United States shall be fined under this title, imprisoned not more than 10 years, or both.

11

Section 1.04(a)(1) of the Texas Penal Code provides that the Texas courts have jurisdiction over criminal conduct if an element of the offense occurs in the State. There is no doubt that the jury found that the intent to commit the aggravated sexual assault was formed in Texas; both the prosecution and the defense emphasized to the jury that they could only convict if Hernandez formed his criminal intent in Texas.[2] There was ample evidence to support this conclusion: In Texas, Hernandez lured Maria over to his trailer, giving her candy, and winning her trust. He also began to fondle Maria in Texas. After executing his plan to kidnap Maria and take her to Mexico, Hernandez raped her.

---

[2]In his closing statement the prosecutor noted:

Remember when [Hernandez' common-law wife] was on the witness stand and she testified [that Hernandez had told her] "Do not butt it. I planned this. This is my plan. I executed this. I've been manosiendo la. [handling her] I've been fondling the child since we were in El Paso." That's how we know what his intent was.

His intent came all the way back to February 18th and prior to that date. The entire time he was enticing this child . . . .

In addition, the defense attorney emphasized that to convict the defendant, the government needed to show that criminal intent had been formed in the Texas:

Certain mental activities had to take place in this country before anything at all happened in Mexico, and you will come across the words "willfully" and "intentionally" and "purpose," you know, all these words relate to certain mental states, intentional states that have to take place in the United States of America.

12

The record therefore supports the jury's conclusion that Hernandez formed the intent to rape Maria while in Texas, and that he could therefore have been charged with criminal sexual assault in Texas. Thus, the prosecution proved the offense stated in the indictment.

VI

Hernandez contends that the district court erroneously applied multiple adjustments to his sentence for kidnaping. When reviewing a district court's application of the United States Sentencing Guidelines, this court will reverse factual findings only if they are "clearly erroneous." United States v. Paulk, 917 F.2d 879 (5th Cir. 1990). The trial court's conclusions of law are reviewed de novo. United States v. Suarez, 911 F.2d 1016, 1018 (5th Cir. 1990).

Hernandez first contends that the upward adjustment under section 2A3.1(b)(4)(A) was erroneous. This section provides for a four-level adjustment if a victim "sustained permanent or life-threatening bodily injury." The definition of "permanent or life-threatening bodily injury" is "injury involving a substantial risk of death; loss or substantial impairment of the function of a bodily member, organ, or mental faculty that is likely to be permanent; or an obvious disfigurement that is likely to be permanent." U.S.S.G. § 1B1.1(h).

Hernandez presented no sworn testimony to rebut the presentencing report. A PSI has the presumption of reliability.

13

United States v. Alfaro, 919 F.2d 962, 966 (5th Cir. 1990). A defendant's unsworn objections are not evidence considered by this court in reviewing a district court's factual findings. Id. A therapist's letter that was attached as an addendum to the PSI report noted that Maria had suffered "permanent psychological harm and will need long term counseling." This conclusion is supported by the extent of the ordeal Maria suffered. Therefore, the court did not err in imposing a four-level adjustment.

Hernandez also contends that he should not have been subjected to a two-level adjustment under Section 2A3.1 of the sentencing guidelines. A two-level adjustment is appropriate "whenever the victim is entrusted to the defendant, whether temporarily or permanently. For example, teachers, day care providers, baby sitters, or other temporary caretakers are among those who would be subject to this enhancement." U.S.S.G. Application Note 3.

Hernandez maintains that Maria was not entrusted to the him: he notes that he "never spoke to Patricia [Maria's mother], much less asked permission or volunteered to supervise Maria." The guidelines, however, do not require that a defendant expressly agree to care for the victim. Instead, the facts must be examined to determine realistically whether the defendant had been entrusted with the care of the victim. In doing so, the evidence clearly demonstrates that Hernandez took custody of Maria. First, Maria testified that Hernandez wanted her to accompany him to the store. This testimony was corroborated by Hernandez's common-law wife.

14

Second, Maria had accompanied Hernandez to the store on several other occasions. When a nine-year-old child travels to a store in the company of an adult, with the permission of the child's parent, the adult has assumed a duty of care over the child--he has been entrusted with the child's well-being. Therefore, the district court's conclusion that Hernandez had been entrusted with Maria's care was not erroneous.

Hernandez finally contends that there is no evidence that he abducted Maria against her will, and therefore, the four-level adjustment imposed pursuant to U.S.S.G. § 2A3.1(b)(5), which provides that an upward adjustment is appropriate if the "victim was abducted," was not appropriate. This guideline The commentary clarifies that "abducted" means the victim was "forced to accompany an offender to a different location."

Hernandez contends that because Maria wanted to go to the local store with him, he did not abduct her. The PSI relied upon the fact that Hernandez brought Maria into Mexico without her parents' consent, not that he merely brought her to a local store. There is ample evidence that although Maria agreed to accompany Hernandez to the store, she did not agree to go to Mexico. Maria repeatedly requested to be taken home. Instead, of honoring these requests, Hernandez lied to Maria, telling her that he was taking her home, when in fact he was taking her into the heart of Mexico. These factors are sufficient to allow the district court to

conclude that Maria had been abducted.  In sum, the district court properly sentenced Hernandez to life imprisonment for kidnaping.

VII

The government concedes that the district court erred when it sentenced Hernandez concurrently to 99-years of imprisonment for his violation of the Mann Act.  The Mann Act carriers a statutory maximum sentence of ten years.  Hernandez's sentence for violating the Mann Act is therefore reduced to ten years imprisonment, to run concurrently with his sentence of life imprisonment for kidnaping.  In all other respects the district court is

A F F I R M E D.

16