# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 13-40689

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

SAMUEL WALKER; CALVIN EPPS, also known as Beef;

Defendants - Appellants

United States Court of Appeals
Fifth Circuit

**FILED**

February 23, 2015

Lyle W. Cayce
Clerk

Appeals from the United States District Court
for the Southern District of Texas
USDC No. 5:12-CR-185

Before STEWART, Chief Judge, and BARKSDALE and GRAVES, Circuit Judges.

PER CURIAM:[*]

This appeal arises from a Drug Enforcement Agency (DEA) sting operation involving large quantities of marijuana and cocaine and a murder-for-hire contract. After their arrests, Defendants-Appellants Samuel Walker and Calvin Epps were tried together in a nine-day jury trial. At the conclusion of the trial, the jury found Walker guilty of conspiracy to commit murder-for-hire in violation of 18 U.S.C. § 1958(a) and using and carrying a firearm during

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 13-40689

and in relation to a crime of violence in violation of 18 U.S.C. §§ 924(c)(1)(A) and (B)(i). The jury found Epps guilty of conspiracy to possess with intent to distribute 5 kilograms or more of cocaine and 100 kilograms or more of marijuana in violation of 21 U.S.C. §§ 846, 841(a)(1), (b)(1), possession with intent to distribute 100 kilograms or more of marijuana in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1), and using and carrying a firearm during and in relation to and possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A). On appeal, Walker and Epps assert various challenges seeking to vacate their convictions. Finding these arguments without merit, we AFFIRM.

**FACTUAL AND PROCEDURAL BACKGROUND**

In December 2010, the Laredo, Texas branch of the DEA launched an undercover operation, which made use of social networking websites in order to make contact with potential drug traffickers. In support of this operation, the DEA created fictitious profiles on websites such as Facebook that were designed to look as if they were operated by individuals involved in the drug trafficking trade in Laredo and along the Mexican border. These profiles were managed by DEA Agents John Leonard and Patrick Curran.

In January 2011, an individual named Marcus Mickle contacted one of the fictitious profiles the DEA had created. Mickle identified himself as a stolen weapons broker from Columbia, South Carolina and stated that he was interested in trading his stolen goods for marijuana. Agent Leonard told Mickle that he owned a legitimate trucking company, which he used to transport narcotics for a Mexican drug cartel called Los Zetas (the "Zetas"), and that he was friends with the son-in-law of a Zeta cartel leader who resided in Mexico. Leonard also claimed that he had a drug distribution route that shipped cocaine to Charlotte, North Carolina on a regular basis.

2

No. 13-40689

On September 14, 2011, Mickle traveled to Laredo, Texas to meet with Agent Leonard, who was accompanied by Agent Curran posing as the son-in-law of a fictitious Zeta leader named "Jefe." Mickle was accompanied by Calvin Epps, whom he introduced as his "money-man." The purpose of the meeting was to negotiate Mickle's proposal to provide weapons to the Zeta cartel in exchange for drugs.

During the September 14 meeting, Agent Leonard reasserted that his company had a drug route that shipped cocaine to Charlotte, North Carolina and claimed that the shipment arrived twice a month. Mickle and Epps claimed that they could serve as a reliable source of weapons for the cartel—including M4s, M6s, and sniper rifles—and proposed that the cartel front them drugs, which they could use "to get [them] started." Epps also claimed that he knew someone serving in the military, who was one of his potential sources for weapons. This source was eventually identified as an individual named Kevin Corley. After some negotiation, the agents agreed to provide Epps and Mickle with 500 pounds of marijuana at $350 per pound and Epps and Mickle, in turn, agreed to use the marijuana to purchase weapons for the cartel and keep a portion of the profits from the marijuana they sold for themselves. Epps and Mickle also agreed that after the first shipment, such transactions would occur on a regular basis for the foreseeable future.

On September 26, 2011, Epps introduced Agents Leonard and Curran to Kevin Corley, Epps' alleged military source for weapons, via a telephonic conference call. During the call, Corley, who was stationed in Colorado Springs, Colorado, told the agents that he was an active duty infantry officer in the United States Army and that he was responsible for training officers and planning missions. Corley offered to use his military experience to train members of the Zeta cartel in military tactics.

3

No. 13-40689

After Epps' initial introduction, the agents continued to speak with Corley directly. On November 2, 2011, during a telephone conversation with Agent Leonard regarding Corley's offer to train Zeta members, Corley brought up the possibility of doing "wet work" on behalf of the cartel. When Agent Leonard repeated the phrase "wet work," Corley stated,

> I mean hey, when it comes time for him to ask me that, you know what I'm saying, if that's what it is that's what it is, you know. . . . I mean I'm pretty sure you got somebody doing something but like I said, whatever I do, it's what I can give you guys whatever that helps, you know what I'm saying.

At the time, Agent Leonard did not know the meaning of the term "wet work" but he eventually learned that the term referred to murder-for-hire.

To investigate Corley's offer, the DEA concocted a fictitious story involving an individual that had supposedly stolen 20 kilograms of cocaine from Jefe and the cartel. Agent Leonard relayed this story to Corley and asked whether Corley would be willing to retrieve the cocaine and kill the individual who had stolen it. Corley stated that he would.

Sometime after discussing the possibility of conducting a murder-for-hire on behalf of the cartel, Corley contacted Samuel Walker, a sergeant in the Army, who was assigned to the same unit as Corley. Corley told Walker that he had met people associated with the Zeta drug cartel and had offered to provide military training to some of its members. Corley also brought up the possibility of the cartel hiring him and a team of his choosing to murder an individual who had stolen 20 kilograms of cocaine from the cartel's leader. Walker stated that he was interested in participating in the contract killing and that he had committed a murder-for-hire previously. Walker also told Corley that he should ask for at least $50,000 for the murder. After Corley spoke with Walker, he told Agent Leonard that he could put together a team

4

No. 13-40689

to help him train Zeta members to have someone "erased from the Earth" and that this team might include a sergeant he knew from his unit.

As the investigation progressed, the DEA arranged for Corley to travel to Laredo, Texas on January 7, 2012, to determine Corley's level of commitment with respect to the murder-for-hire. At this meeting, which took place at a Texas travel center along Interstate 35, Corley met with Agent Leonard and the fictitious Jefe, who was played by another undercover DEA agent. Jefe and Agent Leonard discussed the 20 kilograms of cocaine that had supposedly been stolen from the cartel. The agents told Corley that the cocaine had been taken to a ranch and asked whether he could organize and lead a team to retrieve the cocaine and murder the person responsible for stealing it. Corley agreed and referred to Walker by name as an individual that could be included in the murder-for-hire team. Later that same evening, Corley and Agent Leonard spoke over the phone. Corley confirmed that "Walker's in," meaning that Walker would participate in the murder-for-hire. At that time, Corley was to be paid $100,000 for the murder, of which $40,000 would be paid to Walker. Corley also told Epps about the murder-for-hire contract that he had entered into with Jefe and the cartel.

During the same time period, the DEA continued to investigate Epps and Mickle's drug trafficking efforts. In furtherance of this aspect of the investigation, the agents told Epps and Mickle that the cartel had agreed to front an initial 500 pounds of marijuana, which Epps and Mickle could sell in order to provide the cartel with weapons in accordance with previous negotiations. After this initial fronted transaction, Epps and Mickle agreed that the cartel would then regularly provide them with an additional 500 pounds of marijuana as well as shipments of cocaine every fifteen days.

The agents then set up a "reverse operation," in which Epps, Mickle, Corley, and Corley's cousin Jerome travelled to Laredo, on the pretense of

5

assisting in transporting the 500-pound marijuana shipment back to Columbia, South Carolina. Unbeknownst to these four, however, the DEA never intended nor permitted the marijuana to leave its custody or reach its destination. After Epps, Mickle, Corley, and Jerome arrived in Laredo, they followed Agents Leonard and Curran to a warehouse in order to retrieve the marijuana. They then helped load the marijuana onto a truck—that was to be driven by another undercover DEA agent posing as one of Agent Leonard's drivers—and began to follow the truck back north. In accordance with the DEA's plan, the truck was interdicted by law enforcement soon after it left the warehouse.

When Epps, Mickle, and Corley realized that the truck had been stopped, they immediately called Agent Leonard to inform him of the development. The call was placed on cellular speakerphone in the car with Epps, Mickle, and Corley participating. Epps and Mickle were livid about the loss of the shipment and asked Agent Leonard if the cartel would front them another shipment without a monetary deposit. Leonard responded that Jefe would not agree to front another shipment given the loss of the first one. Leonard also stated that Jefe would be more focused on the murder-for-hire plan, which was next on the Zeta's itinerary. In order to facilitate another drug shipment, Corley offered to finalize arrangements for Jefe's anticipated contract murder as a bargaining chip for Jefe to provide them with another shipment. Leonard told the group that he would take this proposal to Jefe.

After this initial proposal, Epps, Corley, and Mickle began to negotiate the details of the new arrangement with Agent Leonard on behalf of the cartel. With respect to the new shipment, Epps agreed to provide weapons to the cartel as a good faith deposit for another shipment of 500 pounds of marijuana. To satisfy this requirement, Epps wired funds to Corley through Western Union, who then purchased two assault rifles from a sporting goods store.

No. 13-40689

Mickle, in turn, arranged for 5 kilograms of cocaine to arrive in the same shipment, with the help of a relative who purportedly agreed to provide half of the purchase price, $50,000, to facilitate the transaction. Epps and Mickle agreed to receive the cocaine and the marijuana shipment and then store the drugs in a warehouse provided by Mickle's relative.

Meanwhile, Corley finalized the members of the murder-for-hire team, which consisted of himself, Walker, Corley's cousin Jerome, and a fourth associate of Corley's named Shavar Davis. On March 5, 2012, Corley met with Agent Leonard in Colorado Springs and provided him with the two assault rifles that Corley had purchased for Epps to facilitate the second shipment of narcotics from the cartel. During this meeting, Leonard and Corley confirmed the details of the murder-for-hire plan. Corley and his team would commit the murder the same day that Epps and Mickle would receive the shipment of marijuana and cocaine. The DEA had arranged for these two events to coincide so that they could arrest everyone simultaneously and ensure that no one would be tipped off. The location of the ranch where the murder was to take place was in Laredo, Texas and Corley and his team were to meet Agent Leonard in Laredo prior to the murder. In addition, Corley would receive $50,000 and 5 kilograms of cocaine as payment for the murder and would be permitted to keep whatever remained of the 20 kilograms of cocaine the intended victim had supposedly stolen.

Corley told Epps about the murder-for-hire contract and the 25 kilograms of cocaine he was going to receive as partial payment. On a March 10, 2012 phone call, Epps and Corley discussed the impending transactions. The second shipment and the murder were both scheduled to take place on March 24, 2012. Because Corley could not be in South Carolina to meet that shipment, he intended to procure additional narcotics from the cartel in a future shipment. During the phone call, Epps asked Corley to provide him

7

No. 13-40689

with two "birds," a slang term meaning a kilogram of cocaine, from the 20-plus kilograms of cocaine that Corley was to receive for the murder-for-hire.

Corley also contacted Walker and told him that he had gotten the green light to travel to Laredo and commit the murder. Walker agreed to join the team and told Corley that he would bring his .300 caliber Weatherby rifle for the job. Walker and Corley also went to a sporting goods store together to purchase ammunition and then to a gun range to calibrate their weapons. On March 23, 2012, Corley, Walker, Davis, and Jerome drove to Laredo, Texas in a rented vehicle intending to commit the murder. During the drive, Corley assigned each individual a role: Jerome would be the lookout; Davis would be the driver; Walker would be the sniper and "overwatch"; and Corley would retrieve the cocaine and commit the actual murder.

When the group arrived on March 24, 2012, they followed Agent Leonard and the other undercover agents present for the takedown to a warehouse to go over the final plan for the murder. Once in the warehouse, the undercover agents provided maps and photographs purporting to show the location of the ranch where the murder was to take place and explained that they would "bring [the team] to Laredo" and the four would take it from there. In addition, Corley and Walker discussed the logistics of the assault and the strategy they had planned. Walker explained that he had a "high powered" rifle with him, and bragged that it was capable of hitting a target more than two football fields away. Corley and Walker's plan was to have Walker initiate the first shot and then have Corley storm the ranch directly after. Once the DEA determined that each member of the murder-for-hire team had indicated his willingness to participate in the plan, the DEA signaled its arrest team and the group was taken into custody. Walker's Weatherby rifle was recovered in the trunk of the car that he, Corley, and the other members of the murder-for-hire team used in travelling to Texas.

8

No. 13-40689

On the same evening that the murder-for-hire team was arrested in Texas, Epps and Mickle traveled to a hotel parking lot in South Carolina to pick up the shipment of marijuana and cocaine. When Epps and Mickle arrived, they met an undercover agent posing as one of Agent Leonard's truck drivers. The agent asked for the $50,000 down payment for the cocaine, and Epps and Mickle claimed that the money was with a third individual at another location "in the country." When the agent protested, both Epps and Mickle assured him that they had the money and told the agent to follow them to this other location. The agent then told Mickle and Epps to follow him into a hotel room, where they could discuss the situation with Jefe, whereupon Mickle and Epps were both arrested. After Epps was arrested, the DEA retrieved a loaded .25 caliber pistol from Epps' right cargo pocket.

Epps and Walker were tried together in a lengthy nine-day jury trial. During the trial, the government introduced over two hundred audio and video exhibits, including recordings of phone calls, text messages, and recordings of meetings between Walker, Epps, the undercover agents, and the other alleged coconspirators, in which the parties discussed various narcotics transactions and the murder-for-hire arrangements. In addition, law enforcement agents involved in the investigation, including Agents Leonard and Curran, offered testimony in support of the government's case. The government's case also included testimony from the agents who interviewed Epps and Walker after their arrests.

During Epps' post-arrest interview, Epps admitted that he was at the South Carolina hotel parking lot on the night of March 24th, 2012 to meet the cartel's narcotics shipment. Epps intended to split the marijuana with Mickle and sell it in Columbia. Further, although Epps admitted that he was aware that the shipment included cocaine, Epps claimed that cocaine was for Mickle and that he was not part of that aspect of the transaction. Finally, Epps told

9

No. 13-40689

the agents who interviewed him that he knew that Corley had traveled to Laredo, Texas to commit a murder-for-hire.

Walker made similarly incriminating statements after he was arrested. During his post-arrest interview, Walker admitted that Corley had recruited him to participate in the murder-for-hire for the Zeta cartel. Walker told the agents that he had agreed to participate and that he understood the purpose of the plan was to retrieve cocaine that had been stolen from the cartel and to murder the individual responsible. Finally, Walker admitted that he had helped plan the operation with Corley and had brought his Weatherby rifle for purposes of the ranch assault.

Both Epps and Walker testified on their own behalves. Epps admitted that he was a participant in the marijuana distribution conspiracy but claimed that he was not involved in the cocaine transaction, which he attributed to Mickle. Walker denied making the incriminating statements that the DEA agents attributed to him. Walker claimed that he had traveled to Texas with Corley believing that the purpose of the trip was to discuss providing security training for a trucking firm in Laredo. According to Walker, when he met with the agents in the warehouse, he was shocked to discover that the meeting concerned a murder-for-hire for a drug cartel. Walker claimed that he was too afraid to protest once he realized the true purpose of the meeting and decided to pretend to agree to the plan so that he could leave for home after the meeting concluded. Walker also claimed that he brought his rifle solely for recreational purposes.

## DISCUSSION

Walker and Epps seek to vacate their convictions on various grounds. Walker challenges the sufficiency of the evidence in support of his federal murder-for-hire conviction and his firearm conviction. Walker also challenges the district court's jury instruction with respect to the murder-for-hire count.

10

No. 13-40689

Epps challenges the sufficiency of the evidence in support of his drug conspiracy conviction, but only as it relates to the cocaine. Both Walker and Epps challenge a comment made by the district court while instructing the jury, regarding the nature of the evidence that had been adduced at trial. Finally, Epps presses a claim for ineffective assistance of counsel. We consider each argument in turn.

## A.

Walker challenges the sufficiency of the evidence in support of his conviction for conspiracy to commit murder-for-hire under 18 U.S.C. § 1958 (the federal murder-for-hire statute or the murder-for-hire statute). In relevant part, the federal murder-for-hire statute criminalizes the conduct of anyone who:

> travels in or causes another . . . to travel in interstate or foreign commerce, or uses or causes another . . . to use the mail or any facility of interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of . . . anything of pecuniary value, or who conspires to do so . . . .

18 U.S.C. § 1958(a). To prove a conspiracy of the underlying murder-for-hire offense, the government must demonstrate:

> (1) an agreement by two or more persons to achieve the unlawful purpose . . . ; (2) the defendant's knowing and voluntary participation in the agreement; and (3) an overt act committed by any one of the conspirators in furtherance of the conspiratorial object.

*United States v. McCullough*, 631 F.3d 783, 791-92 (5th Cir. 2011) (quoting *United States v. Blackthorne*, 378 F.3d 449, 453 (5th Cir. 2004)). "[T]o convict a defendant of conspiracy to violate [the] federal [murder-for-hire] statute, the Government must prove at least the degree of criminal intent necessary for the substantive offense itself." *United States v. Barnett*, 197 F.3d 138, 146 (5th Cir. 1999) (internal quotations omitted).

11

No. 13-40689

Walker argues that the government failed to adduce sufficient evidence of his intent to commit the substantive offense. While he essentially concedes that there was sufficient evidence that he intended to participate in the murder,[1] he argues that the evidence was not sufficient to demonstrate that he intended that the murder be committed "in violation of the laws of any State or the United States"—as required by the statute—until after the conspiracy was complete. 18 U.S.C. § 1958.[2] According to Walker, the evidence at trial indicated that he was at first led to believe that the murder would take place at a ranch in Mexico. It was not until the March 24, 2012 warehouse meeting, just prior to his arrest, that the fact that the murder would take place in Laredo, Texas was revealed to him. Walker argues that this information was revealed too late because the murder-for-hire team had already travelled interstate from Colorado to Texas, and the conspiracy, according to Walker, was therefore already completed. Walker, thus, argues that he did not possess the requisite intent to commit a murder in violation of any state or federal laws because the crucial information regarding the murder's location was not revealed to him until after the conspiracy ended.

Although Walker presents his argument as a straightforward sufficiency challenge, it necessarily implicates legal questions regarding the proper interpretation of the federal murder-for-hire statute. First, the argument presumes that a murder that is committed outside the United States, such as in Mexico, is not committed "in violation of the laws of any State or the United States." Second, the argument contends that a conspiracy to commit a federal murder-for-hire is completed once the interstate facilities element of the

---

[1] Indeed, the evidence was rather overwhelming with respect to that issue.

[2] Under the federal murder-for-hire statute, the term "State" is defined to include "a State of the United States, the District of Columbia, and any commonwealth, territory, or possession of the United States." 18 U.S.C. § 1958(b).

offense is committed. This is true, according to Walker, even if the central unlawful object of the conspiracy has not yet been achieved and is continuing to be pursued by the conspirators.

Walker moved for judgment of acquittal on his federal murder-for-hire count before the district court but he did not present these legal arguments in support of his motion. Rather, Walker's sufficiency argument before the district court was that his conviction could not be sustained because no actual victim ever existed due to the nature of the DEA's sting operation. Walker no longer pursues this argument before this court.[3] Instead, he raises these statutory arguments for the first time on appeal. Accordingly, we review Walker's arguments regarding the scope of the federal murder-for-hire statute for plain error and will reverse only if, *inter alia*, the error is "so clear or obvious that it is not subject to reasonable dispute." *See United States v. McRae*, 702 F.3d 806, 835 (5th Cir. 2012) (reviewing a sufficiency challenge for plain error where the defendant "did not preserve [his] challenge concerning the meaning of the statute"); *United States v. Kelley*, 481 F. App'x 111, 113 (5th Cir. 2012) (reviewing an argument "couched in terms of sufficiency," which "raise[d] a[n] [unpreserved] legal argument" under plain error). Because Walker has failed to show the claimed errors are clear or obvious, we reject his challenge to his conviction on these grounds. *See United States v. Bueno*, 585 F.3d 847, 850 (5th Cir. 2009).

With respect to Walker's first contention, we are not aware of any United States Supreme Court or Fifth Circuit precedent determining that acts taken in furtherance of a murder that is intended to be committed abroad do not

---

[3] Because the essence of a conspiracy is the agreement to commit an unlawful act, factual impossibility does not necessarily preclude a conspiracy conviction. *United States v. Jimenez Recio*, 537 U.S. 270, 274-76 (2003); *United States v. Burke*, 431 F.3d 883, 886 (5th Cir. 2005).

violate state or federal law.  Indeed, the Fourth Circuit has explicitly held otherwise in rejecting an almost identical challenge to a conviction under the federal murder-for-hire statute.  *See United States v. Morin*, 80 F.3d 124, 126-27 (4th Cir. 1996).  The defendant in that case was convicted under 18 U.S.C. § 1958 after a jury found that he hired an assassin, who in actuality was an undercover FBI agent, to murder an individual in the Philippines.  *Id.* at 126.  After negotiating with the undercover agent over the phone, the defendant flew to Virginia to meet with the agent and provided $1,400 in cash and an airline ticket to the Philippines.  *Id.*  The defendant was arrested at the conclusion of this meeting.  *Id.*

On appeal, the defendant argued that the government failed to establish his "intent that a murder be committed *in violation of the laws of any State or the United States*," because the murder was to take place in the Philippines, outside of the jurisdiction of the United States.  *Id.* (quotations omitted) (emphasis in original).  In rejecting this argument, the Fourth Circuit held that an intended murder may violate the laws of a state "other than those specifically prohibiting homicide."  *Id.* at 127.  As an example, the court identified a Virginia statute criminalizing conspiracy to commit capital murder.  *Id.*  Because the defendant committed acts in furtherance of the conspiracy in Virginia, his intended murder violated that Virginia statute and satisfied the relevant element of the federal murder-for-hire statute.  *Id.*

As in *Morin*, even if Walker intended that the murder occur in Mexico, he would likely be criminally liable for conspiracy to commit murder under Texas law.  *See* Tex. Penal Code Ann. §§ 15.02, 19.02.  The government's evidence at trial established that many of the acts committed in furtherance of the murder-for-hire conspiracy took place in Texas.  The Texas Penal Code extends the state's jurisdiction to criminal offenses when, *inter alia*, conduct "that is an element of the offense occurs inside th[e] state," and when "conduct

inside th[e] state constitutes . . . [a] conspiracy to commit, or establishes criminal responsibility for the commission of, an offense in another jurisdiction that is also an offense under" Texas law.  Tex. Penal Code Ann. § 1.04; *see also United States v. Hernandez-Flores*, No. 96-50477, 1997 WL 420174, at \*5 (5th Cir. June 26, 1997) (per curiam) (unpublished) (upholding a conviction under the Mann Act, 18 U.S.C. § 2423, where the government provided sufficient evidence of "unlawful sexual activity," as required by the statute, because the defendant formed his "intent to commit the aggravated sexual assault . . . in Texas" and was therefore subject to criminal liability pursuant to Tex. Penal Code Ann. § 1.04).[4]  Although, we need not decide whether to interpret the federal murder-for-hire statute in the same manner as the Fourth Circuit on this appeal, given the lack of precedent in support of Walker's construction of the intent element, his argument with respect to this issue fails under plain error review.

Moreover, even if we were to assume that Walker's conviction required an intent that the murder be committed within the borders of the United States, our inquiry would not end there.  Walker's theory with respect to the evidence on this intent issue is that, although there was evidence that Agent Leonard told Corley that the murder would take place on a ranch in Laredo,

---

[4] In instructing the jury regarding the intent necessary to support a federal murder-for-hire conviction, the district court explained that the statute required a defendant to "commit a murder . . . under the laws of the State of Texas, because that's where we are."  We note, however, that Walker's conduct likely also violated federal law.  For example, 18 U.S.C. § 956 provides that criminal liability shall be imposed upon:

> Whoever, within the jurisdiction of the United States, conspires with one or more other persons, regardless of where such other person or persons are located, to commit at any place outside the United States an act that would constitute the offense of murder, kidnapping, or maiming if committed in the special maritime and territorial jurisdiction of the United States . . . if any of the conspirators commits an act within the jurisdiction of the United States to effect any object of the conspiracy.

Texas, there was insufficient evidence that the murder's location had been relayed to Walker.  Walker claims that he did not find out about the location of the murder until the final meeting in the warehouse, just before the DEA arrested the murder-for-hire team, when Agent Leonard and other undercover agents specifically identified the ranch's Texas location to the murder-for-hire team.

Notably, even under Walker's view of the evidence, after the ranch's location was revealed for the first time, Walker verbally expressed his continued willingness to participate in the murder plan.  According to Walker, however, it was too late to join the conspiracy at that time because the murder-for-hire team had already traveled interstate and the conspiracy was complete. In support of this argument, Walker relies on an Eighth Circuit case, *United States v. Delpit*, 94 F.3d 1134 (8th Cir. 1996), which held that once a defendant makes use of "interstate-commerce facilities with the intent that murder for hire be committed[,] . . . the crime [of conspiracy to commit-murder-for-hire] is complete." *Id.* at 1149.  Based on this conclusion, the Eight Circuit vacated a defendant's conviction for conspiracy to violate § 1958, where the defendant participated in a scheme to hire an out-of-state hit man but joined the scheme after the hit man had already traveled interstate.  *Id.* at 1151.  We are not convinced that the issue is so clear.

A conspiracy is a continuing crime and "[w]here the conspiracy contemplates various overt acts and the consequent continuance of the conspiracy beyond the commission of the first act, each overt act thereafter gives a new, separate, and distinct effect to the conspiracy, and constitutes another agreement . . . ." *Pinkerton v. United States*, 145 F.2d 252, 254 (5th Cir. 1944); *see also United States v. Branch*, 91 F.3d 699, 735-36 (5th Cir. 1996) (upholding a conviction for the use of a firearm during a conspiracy to murder federal agents because the conspiracy continued months after federal agents

No. 13-40689

were killed when defendants continued to fire at other agents who attempted to approach); *United States v. Jacobs*, 451 F.2d 530, 539 (5th Cir. 1971) (Although a "conspiracy is complete when the criminal agreement has been entered into and at least one overt act has been performed . . . . [it] does not necessarily end with the completion of the first overt act."); *Huff v. United States*, 192 F.2d 911, 915 (5th Cir. 1951) (where conspirators continue their efforts to commit crime in pursuance of plan, "the conspiracy continues up to the time of abandonment or success") (internal quotations omitted). Moreover, "one who joins an ongoing conspiracy is deemed to have adopted the prior acts and declarations of conspirators, made after the formation and in furtherance of the conspiracy." *United States v. Barksdale-Contreras*, 972 F.2d 111, 114 (5th Cir. 1992). Based on these principles, we have rejected similar arguments regarding the jurisdictional element of a federal statute that prohibits the kidnapping and transportation of a person in interstate or foreign commerce, 18 U.S.C. § 1201.[5] *See United States v. Garza-Robles*, 627 F.3d 161, 169 (5th Cir. 2010); *Barksdale-Contreras*, 972 F.2d at 114. In both cases, the defendants appealed their conspiracy convictions based on an argument that they could not be held liable because their involvement in the kidnapping schemes began after the victims had been transported in foreign commerce. *See Garza-Robles*, 627 F.3d at 169; *Barksdale-Contreras*, 972 F.2d at 114. In both cases, we rejected the defendants' arguments, holding that "[j]oining a conspiracy after a victim has been transported in foreign commerce creates criminal liability for the prior acts." *Garza-Robles*, 627 F.3d at 169; *accord Barksdale-Contreras*, 972 F.2d at 114 ("The entry into the conspiracy of [the defendants] after the

---

[5] In relevant part, 18 U.S.C. § 1201, imposes criminal liability on "[w]hoever unlawfully . . . kidnaps, abducts, or carries away and holds for ransom or reward . . . any person, except in the case of a minor by the parent thereof, when . . . the person is willfully transported in interstate or foreign commerce."

movement across the border does not bar holding them responsible for the prior acts."). While we need not determine on this appeal whether such an analysis applies with equal force to the federal murder-for-hire statute, we are satisfied that Walker's claimed error regarding the duration of the murder-for-hire conspiracy is neither clear nor obvious.

## B.

Walker also challenges the sufficiency of the evidence in support of his firearm conviction under 18 U.S.C. § 924(c)(3). He argues that his conviction for conspiracy to commit a murder-for-hire, 18 U.S.C. § 1958—the offense upon which is firearm conviction was based—is not a "crime of violence" under the statute. As with his challenge to the predicate murder-for-hire offense, Walker moved for judgment of acquittal on this count but did not present the district court with the legal argument he now presses on appeal. Accordingly, we review this issue for plain error. *United States v. Williams*, 343 F.3d 423, 431 (5th Cir. 2003); *see McRae*, 702 F.3d at 834-35. Finding no error, plain or otherwise, we reject Walker's argument.

Section 924(c)(1) prohibits the use of a firearm "during and in relation to any crime of violence . . . ." The term "crime of violence" is defined in section 924(c)(3) as an offense that is a felony and:

> (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

> (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

To determine whether a predicate offense constitutes a crime of violence, we employ a categorical approach, considering whether the "particular defined offense, in the abstract, is a crime of violence." *Williams*, 343 F.3d at 431 (alteration omitted). We do not consider the facts underlying Walker's

No. 13-40689

conviction as his actual conduct is not material to the inquiry. *Id.*; *accord United States v. Jennings*, 195 F.3d 795, 797-98 (5th Cir. 1999).

Walker argues that conspiracy to commit murder-for-hire is not a crime of violence because the statute merely prohibits the use of interstate commerce with intent to murder rather than murder *per se.* This argument fails to account for the full breadth of the definition provided under § 924(c). In enacting § 924(c), Congress determined "that violence need not be a necessary ingredient of the underlying predicate offense." *United States v. Greer*, 939 F.2d 1076, 1099 (5th Cir. 1991); *accord Jennings*, 195 F.3d at 798. "Rather the statute requires merely that the predicate crime create a substantial risk of the possible use of force." *Greer*, 939 F.2d at 1099. "Therefore, if a felony involves a strong possibility of violence . . . , regardless of whether it is an inchoate or a completed crime, it is a 'crime of violence' for purposes" of the statute. *Jennings*, 195 F.3d at 798 (holding that the mere "possession of an unregistered pipe bomb, by its very nature, creates a substantial risk of violence"); *see also Greer*, 939 F.2d at 1099 (holding that conspiring to deny citizens of their civil rights in violation of 18 U.S.C. § 214 is a crime of violence).

We believe that conspiring to use interstate commerce with the intent of committing a murder-for-hire clearly involves a substantial risk of violence. In reaching this conclusion, we are joined by the Fourth Circuit, which observed that "[o]ne can hardly conceive of a more cold-blooded violent act than murder-for-hire . . . ." *United States v. Luskin*, 926 F.2d 372, 379 (4th Cir. 1991) (holding that the federal murder-for-hire statute constitutes a "crime of violence" under 18 U.S.C. § 924(c)). Nor does it matter that the predicate crime supporting Walker's firearm conviction is a conspiracy and not the substantive murder-for-hire offense. We have held that "a conspiracy to commit an act of violence is an act involving a 'substantial risk' of violence," and that conclusion is equally applicable to this case. *Greer*, 939 F.2d at 1099 (quotations omitted).

No. 13-40689

Accordingly, we hold that a federal conspiracy to commit murder-for-hire constitutes a "crime of violence" under 18 U.S.C. § 924(c)(3)(B) and affirm Walker's conviction on those grounds.[6]

## C.

Epps challenges the sufficiency of the evidence to support the jury's finding that he conspired to possess with intent to distribute 5 kilograms or more of cocaine. To establish a conspiracy to possess with intent to distribute a controlled substance, the government must prove beyond a reasonable doubt that: (1) there was an agreement between two or more people to violate narcotics laws; (2) the defendant knew about the agreement; and (3) the defendant voluntarily participated in the conspiracy. *United States v. Wallace*, 759 F.3d 486, 491 (5th Cir. 2014). In addition, where "the government seeks enhanced penalties based on the amount of drugs under 21 U.S.C. § 841(b)(1)(A) or (B), the drug quantity must be stated in the indictment and submitted to the fact finder for a finding of proof beyond a reasonable doubt." *United States v. Daniels*, 723 F.3d 562, 570 (alterations omitted), *modified in part on rehearing*, 729 F.3d 496 (5th Cir. 2013).

Epps was charged with conspiracy to possess with intent to distribute a controlled substance in violation of 21 U.S.C. §§ 841 and 846. The government also sought enhanced penalties based on the specific amount of drug quantities and types of drugs involved. Accordingly, pursuant 21 U.S.C. § 841(b)(1)(A) and (B), the relevant count of the indictment charged Epps with conspiring to possess with intent to distribute a controlled substance and specified that the conspiracy involved: (a) a quantity of cocaine equal to or in excess of 5

---

[6] Because we affirm Walker's conviction under subsection (B) of section 924(c)(3), we need not consider whether subsection (A) also applies to the predicate felony in this case.

No. 13-40689

kilograms of cocaine, and (b) a quantity of marijuana equal to or in excess of 100 kilograms.

The jury found Epps guilty of the drug conspiracy charge. In addition, in a special verdict the jury specified that Epps conspired to possess both the cocaine and the marijuana in the amounts charged in the indictment. On appeal, Epps does not challenge the underlying conviction for conspiracy to possess with intent to distribute a controlled substance. Nor does Epps challenge the jury's finding attributing 100 kilograms or more of marijuana to him. Rather, Epps argues that the evidence was insufficient to find that he conspired with intent to distribute the cocaine and seeks to vacate his conviction on this ground. This argument misunderstands our precedent with respect to the drug conspiracy charges under which Epps was convicted.

In *Daniels*, we considered a case in which the government sufficiently proved that a defendant was guilty of a conspiracy to distribute drugs but failed to prove the specific quantity it alleged in the indictment for purposes of the enhanced penalties it sought. *Daniels*, 723 F.3d at 572-74. In that case, the government charged the defendants with a conspiracy to distribute 5 or more kilograms of powder cocaine. *Id.* at 570. On appeal, we determined that there was sufficient evidence to support the conspiracy conviction but insufficient evidence to demonstrate that the conspiracy involved a quantity of 5 kilograms or more of cocaine. *Id.* at 572.

Despite concluding that there was a lack of proof with respect to the amount of the cocaine, we held that this finding did "not undermine the conviction." *Id.* at 572. In doing so, we distinguished between "the formal elements of offenses under § 841(a)(1) and § 846 from drug quantity and type," which we "described as a 'functional equivalent of an element' for *Apprendi* purposes." *Id.* at 572-73 (quoting *United States v. Toliver*, 351 F.3d 423, 430-31 (9th Cir. 2003), *abrogated on other grounds by Blakely v. Washington*, 542

21

U.S. 296 (2004)). This latter category, we reasoned, "is relevant only to determine the provision of § 841(b) under which defendants may be sentenced," it "is not necessary for a § 841(b) conviction . . . ." *Id.* at 572; *see also United States v. Hernandez*, 202 F. App'x 708, 710 (5th Cir. 2006) (per curiam) ("[T]o find [defendants] guilty under § 841(a)(1), the jury did not have to find that the conspiracy involved an agreement to possess with intent to distribute a certain quantity of cocaine *and* marijuana, only that it involved an agreement to possess with intent to distribute controlled substances.") (emphasis in original); *United States v. Gamez-Gonzalez*, 319 F.3d 695, 700 (5th Cir. 2003) ("[S]ubsection (b) does not make [a defendant's] *knowledge* of drug type or quantity an element of the § 841 offense.") (emphasis in original).

In concluding, we summarized our holding as follows:

[W]here a defendant may be subject to enhanced statutory penalties because of drug quantity or type, the requisite fourth "element" under *Apprendi* is not a formal element of the conspiracy offense. Hence, defendants' challenges to the quantity of cocaine charged in . . . the indictment do[] not go to the validity of their convictions, but rather to the sentence that the district court may impose.

*Daniels*, 723 F.3d at 573.

Here, Epps does not challenge the jury's finding that he conspired to possess with intent to distribute a controlled substance. Rather, Epps seeks to vacate his conviction based on an argument that there was insufficient evidence that he conspired to distribute 5 kilograms of cocaine. However, as Epps does not challenge the jury's finding that he conspired to distribute the 100 kilograms of marijuana, his argument goes only to drug type. And because a failure in proof with respect to drug quantity or type does not undermine Epps' conviction for the substantive conspiracy, his argument with respect to the sufficiency of this "functional element" is unavailing. Accordingly, we

No. 13-40689

affirm Epps' conviction for conspiracy to possess with intent to distribute a controlled substance.

## D.

Walker next argues that the district court erred in failing to adequately instruct the jury with regard to the intent element of conspiracy to commit murder-for-hire. As Walker concedes, because he failed to object to this instruction before the district court, the issue is reviewed for plain error. *See Johnson v. United States*, 520 U.S. 461, 465-66 (1997); *United States v. Fuchs*, 467 F.3d 889, 901 (5th Cir. 2006).

In reviewing a jury instruction, the Court does "not segment it and pass upon isolated statements out of context." *United States v. Chandler*, 586 F.2d 593, 606 (5th Cir. 1978). Rather, the Court considers "whether the instruction, taken as a whole, 'is a correct statement of the law and whether it clearly instructs the jurors as to the principles of law applicable to the factual issues confronting them.'" *United States v. Tolliver*, 400 F. App'x 823, 833 (5th Cir. 2010) (quoting *United States v. Freeman*, 434 F.3d 369, 377 (5th Cir. 2005)). "A district court has substantial latitude in tailoring his instructions so long as they fairly and adequately cover the issues presented by the case." *United States v. Graves*, 669 F.2d 964, 971 (5th Cir. 1982).

After providing the jury with general instructions regarding the offense of conspiracy, the district court provided the following instructions with respect to the necessary elements of murder-for-hire under 18 U.S.C. § 1958:

> I have to tell you what the elements of the crime are, and then remind you again that it's -- that the charge is not committing the crime, but conspiring to do it. But the elements of the crime would be that a defendant, or several defendants, traveled in interstate commerce.
>
> And, also, there's a lot of stuff in the statute about use -- or else using interstate commerce, like phone calls, or wire service, and all that. In this case, I don't need to dwell on that too much.

23

No. 13-40689

Because whatever you believe were in their minds -- there's no doubt that, I think, at least, four of them, took a long trip across interstate lines to come down and, supposedly, do this offense. But that's what's required to make it a federal case, that a defendant cross interstate lines, and that's simply travel between one state and another. And -- and so that's one element.

*And then the second element is that there is an intent to -- to commit a murder. And in this case, under the -- under the laws of the State of Texas, because that's where we are.* And murder is what you would expect it is. It's to intentionally and knowingly cause the death of an individual, not an accident, not negligence. So, again, if the plan is to go hunt down somebody on a ranch and shoot him and kill him, that's murder.

*So this crime of murder for hire is traveling in interstate commerce with the intent to commit a murder,* and -- and to do it for some kind of value, pecuniary value. Money is an obvious one. And there was talk -- I mean, to the extent that this thing was going on, there was talk about, I think, $50,000.00 or something, and, also, cocaine. But it does require that it was -- this -- that the plan has this element of reward, of -- something of value.

(emphasis added). Walker argues that the district court's instructions with respect to the intent element impermissibly lowered the government's burden by: 1) failing to require that the jury find that while Walker traveled in interstate commerce, he possessed the requisite intent to commit a murder within the United States, and 2) implying that merely travelling interstate was sufficient, regardless of Walker's intent during the travel.

Walker's first argument is related to his sufficiency challenge to the murder-for-hire count, in which he argued that under 18 U.S.C. § 1958 the government must prove a defendant's intent to commit a murder within the United States. We have already determined that this argument fails on plain error review and our analysis applies equally to Walker's argument with respect to the jury instruction.

Walker's second argument fails because it conflates the proof required to convict a defendant of the substantive murder-for-hire offense with the proof

24

required to convict a defendant of a conspiracy to commit the offense. As a participant in the conspiracy, Walker need not have traveled at all. *See Blackthorne*, 378 F.3d at 454 ("Even where a conviction for the substantive offense of federal murder-for-hire fails for want of interstate travel, a defendant can be convicted of conspiring to commit the offense."); *see also McCullough*, 631 F.3d at 792-94 (affirming convictions under the federal murder-for-hire statute based on a conspiracy hatched at a federal prison to kill a Mississippi state prosecutor). Rather, he needed to agree to the object of the conspiracy and to voluntarily participate in the plan to carry it out. *McCullough*, 631 F.3d at 791-92; *Blackthorne*, 378 F.3d at 453. Walker's intent at the time he traveled interstate, therefore, is not relevant to his conviction for the conspiracy.

## E.

Both Epps and Walker argue that the district court erred by commenting on the nature of the evidence that was presented at trial. When instructing the jury on the evidence that they were to consider in arriving at their verdict, the district court made the following statements:

> You are limited to the evidence in the case, but you are allowed to draw out of the evidence whatever reasonable inferences you think are justified in the light of your common experience. . . The language we use, the legalese that we use here, is direct evidence and circumstantial evidence.

> *Direct evidence -- and there was plenty of both*. Direct evidence means that somebody came in here and said this is what happened, this is that [sic] I saw, this is what I heard, this is what I did. That's one form of evidence.

> The other form of evidence is what we call circumstantial evidence. Proof of a series of events, that if you take those events and look at them and add them all up, they tell you a story. And all I -- all I can tell you is that that's a perfectly valid form of evidence.

> The law does not make any distinction between the two. It's up to you to, first, decide what you think the evidence -- the background

facts are. And then it's up to you to decide what conclusion you draw from those facts.

(emphasis added). Epps and Walker argue that the district court's comment, "Direct evidence -- and there was plenty of both," implied that there was a great amount of evidence in support of their guilt. Because neither party objected to this comment below, the issue is reviewed for plain error. *See United States v. Carpenter*, 776 F.2d 1291, 1295 (5th Cir. 1985).

"In the federal courts a trial judge may comment on the evidence provided the final decision as to the guilt or innocence of the defendant is left unequivocally to the jury's determination." *Thurmond v. United States*, 377 F.2d 448, 451 (5th Cir. 1967); *see also United States v. Wallace*, 32 F.3d 921, 928 (5th Cir. 1994); *United States v. Cisneros*, 491 F.2d 1068, 1074 (5th Cir. 1974). "Improper comments by a trial judge do not entitle the defendant to a new trial unless the comments are error that is substantial and prejudicial to the defendant's case." *Wallace*, 32 F.3d at 928 (internal quotations omitted). In reviewing this issue, we consider "the record as a whole rather than viewing individual incidents in isolation." *Id.*

As a general rule, we think it is inadvisable for a district court to make an unplanned comment on the quantity of evidence presented at trial. Nevertheless, in the context of this case, it is unlikely that the jury would have interpreted this brief comment as communicating the court's view of the evidence. The comment was likely, and would probably have been understood by the jury as, a reference to the fact that the jury had just sat through eight days of trial, heard testimony from numerous witnesses, both for the government and the defense, and was presented with numerous evidentiary exhibits.

Further, in instructing the jury, the district court explained that the "weight of the evidence is not necessarily based on the number of witnesses

26

who testify" and that it was the jury's function to "make [its] own independent decision about the outcome of the case."  Given these instructions and others–"[I]t's up to you to decide what conclusion you draw from those facts. . . . You don't have to accept all of the evidence in the case. One of the main functions of a jury is to decide what evidence you accept and what you don't accept. . . . [O]ne of the main . . . functions of a jury is to decide who you believe and who you don't believe."–we conclude that the district court's comment prejudiced neither Walker's nor Epps' case.  Thus, based on the jury instructions as a whole, the district court's reference to the amount of evidence did not result in reversible plain error.

## F.

Finally, Epps argues that his conviction should be vacated because his trial counsel was ineffective for failing to object to the district court's comment regarding the amount of evidence adduced at trial.  "The general rule in this circuit is that a claim of ineffective assistance of counsel cannot be resolved on direct appeal when the claim has not been raised before the district court since no opportunity existed to develop the record on the merits of the allegations." *United States v. Higdon*, 832 F.2d 312, 313-14 (5th Cir. 1987); *accord Wallace*, 32 F.3d at 930. Based on record before us, we see no reason to depart from this general rule.  *See United States v. Cortez*, 578 F. App'x 420, 421 (5th Cir. 2014) (per curiam); *Wallace*, 759 F.3d at 498.  Accordingly, we decline to address Epps' ineffective assistance of counsel claim.

## CONCLUSION

For the foregoing reasons, the judgments are AFFIRMED.